STATE ROADS COMMISSION OF THE STATE
HIGHWAY ADMINISTRATION *v.*
PARKER ET UX.

[No. 178, September Term, 1974.]

*Decided August 29, 1975.*

652

The cause was argued before SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Carl Harrison Lehmann,* with whom were *Francis B. Burch, Attorney General, Nolan H. Rogers, Special Assistant Attorney General,* and *Richard T. Brice, IV, Special Attorney,* on the brief, for appellant.

*Carlyle J. Lancaster,* with whom were *Lancaster, Bland, Eisele & Herring* and *Theodore L. Miazga* on the brief, for appellees.

O'DONNELL, J., delivered the opinion of the Court.

On August 7, 1968, the appellant, State Roads Commission, pursuant to the provisions of Maryland Code (1957, 1964 Repl. Vol.), Art. 89B, § 9,[1] filed a petition in the Circuit Court for Prince George's County to "quick take" a parcel of 1.83 acres, running a distance of 732 feet along the eastern boundary of a tract totalling 10 acres owned by Roscoe H. Parker and his wife, the appellees, in Largo, for the relocation of Landover Road (Maryland Rt. 202). In accordance with the provisions of the statute, the Commission deposited with the clerk of the court $65,308.94, its estimate of the "fair market value" of the portion taken by it for the highway construction.

The appellees requested that the case be referred to the Board of Property Review for a determination of the value of the property, without prejudice to their right to have the matter considered by a jury. See Code (1957, 1964 Repl. Vol.), Art. 89B, §§ 17-20 [2] and Maryland Rule U27. Dissatisfied with the award determined by the Board, the Commission on May 1, 1969, requested the reinstatement of the condemnation proceedings. After the matter had laid dormant for more than four years, the Commission, with leave of the court, filed an amended petition to include within the scope of the condemnation, the entire rectangular 10-acre tract of the appellees so that an interchange could be constructed thereon between Central Avenue (Maryland Rt. 214) and the reconstructed and relocated Landover Road.

Described as rolling and wooded land, the acreage "fronts" along its northern boundary for a distance of 530 feet on Central Avenue. It had no frontage along the relocated Landover Road since access thereto was denied upon the "quick taking." Situate upon the land were several delapidated farm buildings conceded to have no significance in the valuation of the acreage. Zoned as "C-2" (general

---

1. Now codified, as Maryland Code (1957, 1969 Repl. Vol. [1974 Cum. Supp.]), Art. 89B, § 9.

2. Now codified with amendments as Code (1957, 1969 Repl. Vol. [1974 Cum. Supp.]), Art. 89B, §§ 17-20.

commercial),[3] the property is located approximately one mile east of the intersection of Central Avenue and the Capital Beltway. Three miles to the north is located the Landover Mall, a large shopping center; one mile to the northwest, the new Capital Centre Sports Arena conducts sports contests and entertainment events almost nightly. A small shopping center, Hampton Mall, is located one mile westward; Prince George's Community College campus is one and one-half miles to the south and a garden apartment development is located immediately southwestward. Within the general geographical area there are 4,000 acres described as being in the "early stages of intensive residential development" together with related commercial service facilities. Just to the east and southeast of the subject property — off Central Avenue — is a prestigious single family residential development named "Kettering," which is served by a small shopping center on that avenue. A gasoline filling station, a fruit stand and a dry cleaning establishment were described as being operated at the intersection of Routes 214 and old Route 202.

During the proceedings before the jury leading to the inquisition, the appellant produced testimony from two expert witnesses — Messrs. Roy K. Davis and Paul J. Gilroy. Davis placed a fair market value upon the 10 acres of $501,200.00; Gilroy's appraisal was $450,000.00. Two expert witnesses who testified on behalf of the appellee-owners, Messrs. John L. Richards and Adelbert W. Lee were of the opinion that the property being taken had a value of $3 per square foot, or a total fair market value of $1,306,800.00

The jury, apparently finding the opinion testimony of Messrs. Richards and Lee to be the more persuasive, on July 1, 1974, by their inquisition awarded the condemnees $1,306,800.00.

The appellant, aggrieved at the valuation placed upon the tract by the jury, contends in its appeal here that the trial court (Judge George Sachse [4]):

---

3. The appellant classifies the zoning as "heavy commercial."

4. Of the Circuit Court for Anne Arundel County, specially assigned to the Circuit Court for Prince George's County.

I. Abused its discretion by admitting evidence of comparable sales: (a) sales of lots grossly disparate in size from the subject property, (b) sales of lots incompatibly zoned in that they were zoned industrial and (c) sales proximately remote from the subject property;

II. Committed prejudicial error by remarks made in the presence of the jury tending to buttress the appellees' valuation testimony;

III. Erred by sustaining objections to questions upon cross-examination of appellees' appraisers when it "sought to ascertain if the latter understood a relevant principle implicit in the statutory definition of 'fair market value' "; and

IV. Erred in not granting appellant's instruction that comparable sales "can be viewed as primary or independent evidence of value."

I

It must be observed at the outset that there is a conflict concerning the existence of utilities to service the subject acreage; although appellant authoritatively states that no utilities serve the property and a four-year-old sewer moratorium was in effect upon the stipulated date of valuation, it points to no such evidence in the record. Contrariwise, both the expert witnesses on behalf of the appellees gave testimony in connection with the existence of water and sewer; John L. Richards, acknowledging the existence of a "sewer moratorium," testified that a public water system served the property, that a ten-inch sewer line and terminal was within 60 feet of the property line and that such service would be available "in the very near future" since the capacity of Western Branch was being increased. The witness Lee testifed that the property "had water across the front" and that "sewer was in very close proximity in the rear."

In testifying concerning his opinion on the "fair market value" of the tract being condemned, the witness Lee listed

as comparable sales six transactions, occurring between 1970 and 1972, five of which such properties were zoned "C-2" and the sixth of which was zoned "C-O." [5] The property so sold ranged in area from 33,706 sq. ft. to 199,421 sq. ft. and ranged in price between $2.28 per sq. ft. and $4.03 per sq. ft., or from $99,317.00 per acre to $175,547.00 per acre. The appellant objected to the inclusion of three of these transactions as not being "comparable sales." It objected to the property zoned "C-O," which contained 199,421 sq. ft.—and which had sold at $2.28 per sq. ft. — involving the largest area and the lowest price per sq. ft. of all the properties described by the witness Lee, solely on the ground of the incompatibility of the zoning classification. There was no evidence concerning the proximity of that acreage to the subject property. A property consisting of 33,706 sq. ft. (.77 acres) which had been sold at $4.03 per sq. ft. was objected to as being dissimilar in size. The third such sale objected to pertained to a parcel of land containing 53,316 sq. ft., which had been sold at $2.57 per sq. ft. which was objected to solely on the basis of its distance from the subject property. Although the appellant alleges in its brief that that sale involved property located "12 miles" distant and argues that it was "15 miles" removed from the subject property, the testimony disclosed that it was described as being located "7 to 8 miles" from the Parkers' land. Each of these objections was overruled by the trial court.

The appellant made no objection to the other three sales considered by the witness Lee; these were described as containing, respectively, 33,956 sq. ft. (.78 acres), 34,512 sq. ft. (.79 acres) and 48,358 sq. ft. (1.13 acres) with sale prices, respectively, of $2.72, $2.50 and $3.55 per sq. ft. Each of the unobjected-to sales pertain to property located between seven and ten-and-one-quarter miles from the property being condemned.

The witness described each one of said sales as each having

---

5. A classification of "C-O" means "commercial-office"; classifications "C-1" and "C-2" each permit office use as well. Eight additional sales considered by the witness Lee pertaining to properties of one-half acre or less were not proffered by him.

been made by "well informed buyers," each involved property zoned "commercial" and all were described as having a comparable traffic flow and type of development within their areas. It was further the opinion of the witness that although property zoned "C-O" was limited to office use, property zoned "C-2" authorized generally commercial enterprises — including office use. The witness was never cross-examined by the appellant concerning the property zoned "C-O," although the asserted differences in zoning were the sole basis for its objection.

Fifteen sales made between 1969 and 1973 located from within 800 feet of the subject property to a maximum of two miles distant were submitted by the witness Richards. Challenging their comparability the appellant objected to all but four of such transactions.[6] The trial court sustained its objections to four of the sales which involved tracts of less than one-half acre in size and property zoned for high-density apartments; its objections to the remainder of the sales were overruled.

Six of the property sales considered comparable by Richards were of land zoned "I-1" (Industrial-light); five were zoned, as was the subject property, as "C-2." Objection was made solely on the grounds of incomparability as to five of the six sales of land zoned "light industrial." Objection to the sixth such sale (of 42,112 sq. ft.), also on the ground of incomparability was not limited to its zoning classification but included as well its size. Objection was made to only one of the sales of property zoned "C-2" and this was predicated upon asserted differences in a number of the features of the sale. The sales considered by Richards, to which no objections were made involved properties all zoned "C-2" which ranged in size from 42,000 sq. ft. (.97 acres) to seven acres and which had been sold at prices ranging from $1.13 (for the seven-acre tract) to $2.78 (for the .97 acre site) per square foot.

In comparing each of the described transactions, Richards

---

6. Appellant indeed objected to another such sale but when counsel's attention was directed to the inclusion of that same transaction by its expert witness, Gilroy, the objection was withdrawn!

made adjustments — both upward and downward — in the prices for which said properties had been sold to allow for increases in valuation due to inflation, from the date of such sales to the time of trial, made adjustments for differences in zoning classifications, for the size, shape and frontage of the acreage sold, in comparison to the subject property, and made adjustments as well to compensate for differences in topography and the existence vel non of utilities upon the sold properties. It was his opinion that "C-2" zoning was a "better" classification for obtaining the highest and best use of the property. Basically he added a ten-cent per sq. ft. adjustment upward to each of the reported sales to compensate for the zoning differences.

On cross-examination it was the witness' view that a district zoned "commercial" permitted "more variety of uses" than that allowed in a district zoned "light industrial" and that one "has less trouble getting zoning for commercial land than . . . for industrial."

The objection to the sale of the sole property zoned as "C-2" involved 1.32 acres which had been sold in 1968 by the Simplex Land Co. to the Boron Oil Co. — for a filling station site — which was located on the south side of Central Avenue (Rt. 214) 800 feet southwest of the subject property. It was the same acreage (53,315 sq. ft.) which the appellees themselves had sold at $2.25 per sq. ft. to the Simplex Land Co. and which, according to the testimony of the appellee Roscoe H. Parker, had been resold — on the same day by Simplex — for $2.78 per sq. ft. In his testimony Roscoe Parker described that lot as being located 435 feet from the "boundary of the subject property" and projecting an allowance for inflation since 1968, calculated its value, as of the time of trial, at $4.17 per sq. ft.

Each of the appraisers — both for the appellant and the appellee — in stating his opinion of the fair market value of the acreage being taken, employed the "comparable sales" approach, but each used a different methodology. All agreed that the location of property so sold was an important element in helping to assess its comparability, but to each, however, location carried a slightly different weight. To the

appellant's appraiser, Roy K. Davis, whose testimony was limited to five such sales, it meant the "general neighborhood." To its other appraiser, Paul J. Gilroy, who listed only three such comparable sales, it literally meant that the closer the property sold was to the subject property, the more comparable was the sale. The appellees' witness Lee was of the view that physical proximity of the reported sales was only one element in determining comparability and that adjacent geographical areas with similar traffic flow counts and adjacent economic development provided "very comparable locations." To Mr. Richards the general economic area provided a basis for comparability and he emphasized that the principal element in his opinion of valuation was the "location of the subject property in an area of intense and rapid commercial development." Having limited his analysis of comparable sales to those occurring within a two-mile radius, he emphasized that the appellees' property was "located at the cross-roads of Prince George's County" and compared its location to a similar area in Montgomery County at the intersection of the East-West Highway and Wisconsin Avenue.

By way of contrast, it appears from the record that the expert witnesses for the appellant did not give any consideration in their opinion evaluation to the rapidly changing economic state of real estate values in the general area of Largo, nor did either of them make any adjustments for any differences whatsoever between the land being condemned and the eight sales they considered to be comparable which ranged in size from 2.34 acres to 32.68 acres.

As early as 1915 our predecessors in a condemnation proceeding, in *Patterson v. Mayor & City Council of Baltimore*, 127 Md. 233, 96 A. 458 (1915), stated:

"It is the settled law, in this State and elsewhere, that in establishing the value of land, the prices realized at the sales of similar lands in the vicinity, made within a reasonable period of time theretofore, being voluntary and not forced sales,

are admissible in evidence, either on direct or cross-examination of witnesses conversant with the facts. *Mayor and City Council of Baltimore v. Smith*, 80 Md. 472-473, and other cases there cited.

"In regard to the degree of similarity which must exist and the nearness in respect of time and place no general rules are laid down, and as the trial judge is usually conversant with such matters they must be left largely to his discretion." 127 Md at 241, 96 A. at 461.

The rule stated in *Patterson* has been explicated and applied in *Lustine v. State Roads Comm'n*, 217 Md. 274, 142 A. 2d 566 (1958); *Bergeman v. State Roads Comm'n*, 218 Md. 137, 146 A. 2d 48 (1958); *Winepol v. State Roads Comm'n*, 220 Md. 227, 151 A. 2d 723 (1959); *Hance v. State Roads Comm'n*, 221 Md. 164, 156 A. 2d 644 (1959); *Taylor v. State Roads Comm'n*, 224 Md. 92, 167 A. 2d 127 (1961), and *State Roads Comm'n v. Adams*, 238 Md. 371, 209 A. 2d 247 (1965) — to mention but a few of our cases discussing the admissibility of expert testimony pertaining to "comparable sales."

In *Lustine*, the trial court had ruled inadmissible testimony by one of the appellant's experts concerning two transfers which he had considered as "comparable sales"; one was of a 42-acre parcel of land, approximately one-half mile from the subject property which had been formerly used as a gravel pit but which had been graded and laid out for subdivision purposes before its sale; the other transaction related to an adjacent parcel of 17 acres which had been "raw land" prior to its sale for subdivision purposes but which was "served by a dead end road." In reversing, this Court, in connection with these evidentiary rulings, stated:

"We think that the court, in ruling out testimony as to the sales prices of these properties, as not being comparable, was unduly restrictive. We are aware that there is considerable latitude in the exercise of discretion by the lower court in determining

comparable sales. *Patterson v. Mayor and City Council of Baltimore*, 127 Md. 233, 241, *Williams v. New York, P. & N. R. Company*, 153 Md. 102, 108. It should be borne in mind, however, that real estate parcels have a degree of uniqueness which make comparability, one with the other, in a strict sense, practically impossible. We think it the better policy, where there are any reasonable elements of comparability, to admit testimony as to the sales, and leave the weight of the comparison for the consideration of the jury, along with such distinguishing features as may be brought out on cross-examination or otherwise. *Forest Preserve District of Cook County v. Eckhoff*, 372 Ill. 391, 24 N. E. 2d 52. *Cf. Turner v. State Roads Commission*, 213 Md. 428, 431." 217 Md. at 280-81, 142 A. 2d at 569.

In *Bergeman*, the appellants contended that two of the sales described by an expert witness for the State Roads Commission were not comparable because the properties were not, when sold, located in a commercial zone. This Court, in sustaining the admissibility of such evidence recognized, that it is "generally true that property in a residential zone is less valuable than in a commercial zone which would make them not truly comparable, but we have held that the probability of rezoning within a reasonable time may be taken into account in some situations," and pointed out, citing *Lustine, supra*, that the "trial court" has a wide discretion in determining what sales are reasonably comparable, leaving the weight of the comparison for the consideration of the jury.

In connection with the opinion of the expert witness, the Court stated:

"It is trite to observe that the weight of evidence is for the triers of fact, or for the court on motion for new trial. We are only concerned with the legal sufficiency of the evidence to support the verdict, and in passing upon that question the testimony, and all proper inferences therefrom, must be

considered in a light most favorable to the plaintiff's case. *Safeway Stores, Inc. v. Barrack,* 210 Md. 168, 173. We have also said that 'the opinion of [an expert] witness, and the grounds upon which it was formed, and the weight to be attached thereto, were matters for the consideration of the jury.' *Davis v. State,* 38 Md. 15, 41; *Marshall v. Sellers,* 188 Md. 508, 518. The value or weight of the opinion of an expert is dependent on, and is no stronger than, the facts on which it is predicated. Cf. *Grant v. Curtin,* 194 Md. 363, 385. The conclusions of the witnesses as to value in the instant case depend upon basic facts to which the formulae are applied, and we perceive no reason why the jury should not be permitted to draw their own conclusions from such basic facts as they may choose to find, if supported by testimony or permissible inferences therefrom. We think there was legally sufficient evidence to support the verdict." 218 Md. at 144, 146 A. 2d at 52.

In *Winepol,* the holdings in *Lustine* and in *Bergeman* were described as an approval of "the liberal approach" to the admissibility of such evidence.

In *Hance v. State Roads Comm'n,* the property owners on appeal asserted inter alia error by the trial court in two of its evidentiary rulings. An expert for the condemnor used the capitalization of rent method of appraisal in connection with two of the three buildings located upon the land. When asked why he did not use the capitalization method with reference to the third building, he replied that in his opinion it was not "fit for human habitation." The refusal of the trial court to strike this answer was asserted as error. Additionally, a real estate appraiser produced on behalf of the owners was precluded from offering as evidence of a comparable sale a transaction which had occurred subsequent to the "taking" of the property by the appellee.

In rejecting the appellant's contention concerning the lack of habitability of one of the buildings, Judge Prescott, who delivered the opinion for the Court, stated:

"We think the evidence objected to in the case at bar was clearly relevant and admissible. It was nothing more nor less than an expert, who had expressed his opinion as to value, stating his reasons for the opinion given; and these reasons may be elicited by the party who has called the witness, as well as by the opposite party upon cross-examination. In *Baltimore Belt R. R. Co. v. Sattler*, 102 Md. 595, 602, 62 A. 1125; 64 A. 507, this Court said, '[a]n expert witness * * * may give his opinion as to the value of the property * * * and he may state to the jury the reasons upon which his opinion is based, in order that they may judge of the value of his testimony.' Again, in *Baltimore City v. Hurlock*, 113 Md. 674, 683, 78 A. 558, the Court quoted, with approval, from an Illinois case as follows: 'The facts upon which opinions of expert witnesses as to the value of property proposed to be taken in condemnation proceedings, may be stated by them, either in chief, or upon cross-examination' * * * as their [the opinions'] weight and value depends largely upon the foundation of fact and reason upon which they stand.' See also *M & C. C. of Balto. v. Smith, etc. B. Co.*, 80 Md. 458, 472, 31 A. 423, 2 Wigmore, *Evidence* (3rd Ed.), Secs. 562, 655. Cf. *State Roads Comm. of Md. v. Novosel*, 203 Md. 619, 626, 102 A. 2d 563." 221 Md. at 168-169, 156 A. 2d at 646.

Although the Court did find that it was error to have excluded the evidence concerning a comparable sale solely on the basis of it having occurred subsequent to the taking, the Court was "unable to see how the exclusion of this one sale worked any real harm to or substantially prejudiced the appellants" and that "it was doubtful that this ruling of the trial court made any difference in the jury's verdict, much less a substantial one." After noting that no proffer was made in connection with the evidence which had been rejected, it stated, "Courts are reluctant to set aside verdicts for errors in the admission or exclusion of evidence unless

they cause substantial injustice. This is especially true in condemnation proceedings. Such cases usually consume much time in trial, and are expensive in nature. As a rule, they are determined by a myriad of different items of evidence." 221 Md. at 176, 156 A. 2d at 650.

In *Taylor*, one of the grounds urged for reversal was the contention by the land owners that the testimony of an expert for the appellee as to a comparable sale should have been excluded because the property referred to by him was "zoned," whereas the property being condemned was "not zoned." Although this contention was rejected because the record did not disclose how the lots in the sale had in fact been zoned, the Court, again through Judge Prescott, pointed out that "this Court has stated, and repeatedly restated, the rule in Maryland."

After quoting from *Lustine v. State Roads Comm'n*, *supra*, (as we have hereinabove set forth) he further wrote: "the rule as thus stated conforms with the great weight of authority elsewhere (citations omitted)."

Judge Barnes, for this Court, in *State Roads Commission v. Adams*, *supra*, in a review of the rule and our antecedent holdings, stated:

"In Maryland it is well settled that evidence of the price for which similar property has been sold in the vicinity may legitimately be used in support of, and as background for, the opinion of an expert testifying as to the value of the property taken in condemnation proceedings. *Williams v. New York, P. & N. R. Co.*, 153 Md. 102, 108, 137 A. 506 (1927); *Patterson v. Mayor & City Council of Baltimore*, 127 Md. 233, 241, 96 A. 458 (1915). There is a conflict of authority nationally upon the question of whether the price paid at voluntary sales of land similar to that taken is admissible as independent evidence of the value of the land taken. See Annotation, 85 A.L.R.2d 110 (1962), *'Admissibility on issue of value of real property of evidence of sale price of other real property.'* We adhere to the 'Massachusetts' or 'majority' view that evidence of

such sales is admissible as primary evidence of the value of the property taken, or to support an expert witness's opinion as to such value, or both. *Hance v. State Roads Commission, supra; Taylor v. State Roads Commission,* 224 Md. 92, 167 A. 2d 127 (1961); see 5 Nichols, *Eminent Domain* (3rd ed.), Section 21.3 [1]. In those states which adhere to the Massachusetts view the question frequently arises as to whether or not the conditions of other real property together with the circumstances surrounding its sale, are sufficiently similar to those of the land taken as to permit the admission of the sale price of the former as evidence of the value of the latter. In *Lustine v. State Roads Commission,* 217 Md. 274, 142 A. 2d 566 (1958), we held that the trial court has 'considerable latitude' (or 'wide discretion,' *Bergeman v. State Roads Commission,* 218 Md. 137, 146 A. 2d 48 (1958)) in determining what sales are 'reasonably comparable.' Moreover, we went further in *Lustine* and declared it the *better policy to admit testimony as to the sales where there are any reasonable elements of comparability, and leave the weight of the comparison to the consideration of the jury, together with such contrasting or distinguishing features as may be brought out on cross-examination or otherwise (Lustine,* p. 281 of 217 Md.). Cf. *Winepol v. State Roads Commission,* 220 Md. 227, 151 A. 2d 723 (1959) and *State Roads Commission v. Smith,* 224 Md. 537, 548-549, 168 A. 2d 705 (1961). The appellant states that the question to be decided is whether Judge Macgill's rulings were 'correct,' but this formulation of the issue is ambiguous and perhaps misleading. *We do not undertake to weigh the similarities vel non between allegedly comparable properties as matters of first impression in this Court to be decided without reference to the action of the trial judge. Rather, we decide only whether the standards enunciated in Lustine and Bergeman as applied to the facts of a*

> *given case 'compel a finding that the trial court*
> *abused its discretion,' Winepol v. State Roads*
> *Commission, supra, in admitting or refusing to*
> *admit the contested evidence.* Even a finding of
> abuse of discretion does not compel a reversal: see
> the comments of Judge Prescott, speaking for the
> Court in *Hance, supra,* at page 176 of 221 Md.,
> discussing the reluctance of the courts generally to
> set aside judgments in condemnation cases for
> errors in the admission or exclusion of evidence, in
> the absence of express showing that these errors
> caused 'substantial injustice' to the complaining
> party." (Emphasis supplied.) 238 Md. at 378-79, 209
> A. 2d 250-51.

In *Adams,* the Court held that there was no abuse of the
wide discretion vested in the trial court when it admitted
evidence of a sale of 280.3 acres of farm land, with a few out
buildings thereon in a trial where the State Roads
Commission was condemning 12.65 acres of the appellee's
196 acre dairy farm. The Court pointed out that the "tract
[was] sufficiently close, in point of location and distance,
and the sale thereof, sufficiently near, in point of time, as to
furnish a test of the present value, other considerations
aside." After pointing out that *Taylor v. State Roads
Commission, supra,* had made it plain that the "5 year and 5
mile limits" was not a rule of law we held, "as a legal
proposition," that the sizes of the respective tracts (196 acres
owned by the appellee and 280.3 acres in the "comparable
sale") were not "grossly dissimilar."

After holding that "appellant's contentions go to the
weight rather than to the admissibility of the disputed
evidence," the Court stated:

> "[W]e base our disposition of these objections on
> the additional ground that there has been no
> satisfactory showing that the admission of the
> challenged evidence worked any 'substantial
> injustice' to the appellant. [footnote omitted.]
> *Hance v. State Roads Commission, supra.*

Prejudice, or the lack of it, is always of significance to an appellate court, and it assumes increased importance in condemnation cases, in view of the 'myriad of different items of evidence' sought to be introduced, (*Hance*, at 176). See *Mayor & City Council of Baltimore v. State Roads Commission*, 232 Md. 145, 151, 192 A. 2d 271 (1963)." 238 Md. at 381-82, 209 A. 2d at 252.

In affirming the judgment entered on the inquisition, the Court stated further:

"[T]he appellant has singularly failed to show what substantial injustice has been done to it. We are not dealing with an award of damages whose size is greatly in excess of the highest estimate of the appellees, and which must be taken to be based entirely upon the impressions gained by the jury from its view of the premises. Cf. *Bergeman v. State Roads Commission, supra,* at 142-143 of 218 Md. Nor does the verdict rest upon the untutored judgment of the property owner." 238 Md. at 385, 209 A. 2d at 254.

In *Smith v. Potomac Electric Power Co.*, 236 Md. 51, 202 A. 2d 604 (1964) while recognizing that "in condemnation suits we have held admissible evidence of comparable sales as an aid in determining value and we have left much to the discretion of the trial court in deciding what sales are sufficiently comparable to be admissible," this Court found no abuse of discretion when the trial court excluded proffered evidence as to the rentals of a tract of land, developed as an industrial park less than a half mile distant from the land being condemned, because the two tracts were not comparable and the valuation was too speculative in character. The tract being condemned was raw land, scarred from mining operations, in need of regrading and was wholly undeveloped for use as an industrial park. By contrast, the condemned tract was a developed industrial park with improved roads and utilities, including five railroad sidings and a number of constructed and

industrially-used buildings. *See also Winepol v. State Roads Comm'n, supra,* where it was held not to have been an abuse of discretion to have excluded evidence of a sale in a "shopping district concededly of much higher grade than that in which the store of the appellant was located, and that its frontages on two commercial streets gave it an extraordinary and almost unique value." 220 Md. at 231, 151 A. 2d at 725-26; and *Greater Balto. Cons. Mkt. Authority v. Duvall,* 255 Md. 90, 256 A. 2d 882 (1969), where it was held the trial court properly refused, as being too speculative a basis for valuation, proffered evidence from the property owner concerning the value of his undeveloped land based on his intention to ultimately develop the land for an industrial park and his belief concerning the valuation of finished sites in a neighboring industrial park.

In *Taylor v. State Roads Comm'n, supra,* this Court approved the method whereby an expert witness in connection with his opinion evidence of value makes "adjustments" in connection with sales he considers to be comparable. *See also State Roads Commission v. Wyvill,* 244 Md. 163, 171, 223 A. 2d 146, 149-50 (1966) where a comparable sale was adjusted upward for time and downward because of location, and *First Nat'l Realty v. State Roads Comm'n,* 255 Md. 605, 611, 258 A. 2d 419, 422 (1969).

The appellant's expert witness Gilroy recognized the problem in attempting to locate sales which could be considered to be comparable when he stated "you try to get the properties with pretty much the same utility. However, in this case it wasn't easy because there weren't that many sales in the area that I felt were comparable to the subject zoning-wise and utility-wise." He limited such sales to three in number since he felt that the "closer" they were to the subject property "the more comparable they were."

As this Court pointed out in *Lustine, supra,* "real estate parcels have a degree of uniqueness, which makes comparability, one with the other, in a strict sense practically impossible.

What the Utah court stated in *Redevelopment Agency of*

*Salt Lake City v. Mitsui Inv., Inc.,* 522 P. 2d 1370 (Utah 1974), cited by the appellant, concerning the exercise of "common sense" in this area as to the admissibility of such evidence is here particularly apropos. That court stated:

> "On the question of evaluation property, as in most areas of the law, a resort to common sense and practical experience is helpful. Real estate has always been regarded as unique because *no two parcels can be exactly alike.* . . . It is certainly not to be supposed that there will be found sales which are identical as to time, location, quantity and various characteristics of the property. The requirement is that it meet the test of *'reasonable comparability.'* That is, that these factors exist in sufficient similarity that the sale can fairly be regarded as having *some probative value* in arriving at a proper appraisal of the property." (Emphasis supplied.) 522 P. 2d at 1373.

In striving for proximity the witness Richards, on behalf of the appellee, limited such sales to a radius of two miles, even though a number of such sales involved property zoned "light industrial." The sale from Simplex Land Co. to Boron Oil Co. was, in distance, that closest to the property being condemned. Although the sales described by the appellee's witness Lee, were as much as 10 miles distant, all such properties were of land zoned "commercial."

Although the appellant in its brief, by arbitrarily packaged passages reminiscent of the chapters in James Joyce's "Ulysses" recites in great factual detail a jury-type argument in support of dissimilarities between the land being condemned and the properties described by the witnesses Lee and Richards to which it made objection because of "size," "distance" and "zoning," it overlooks the fact that "[w]e do not undertake to weigh the similarities vel non between allegedly comparable properties as matters of first impression in this Court to be decided without reference to the action of the trial judge." Our function is to "decide only whether the standards enunciated in *Lustine*

and in *Bergeman* as applied to the facts of a given case 'compel a finding that the trial court abused its discretion' " in admitting the contested evidence. *State Roads Comm'n v. Adams, supra.* As we see it those sales recited by the witnesses Lee and Richards were not "grossly dissimilar" in either acreage, or in remoteness, or in being zoned as "light industrial" to the appellees' land so as to require that they should have been excluded as having no "probative value" in assisting at a proper evaluation of the property. The sales described, and to which objection was made, in an area of rapid and intense economic development contained "reasonable elements of comparability." The weight of the comparisons and such contrasting or distinguishing features as may have been elicited by cross-examination or otherwise, was for the consideration of the jury.[7] *State Roads Comm'n v. Adams, supra, Taylor v. State Roads Comm'n, supra.* References to such sales were merely predicates upon which the witnesses for the appellee undertook to arrive at an opinion of the fair market value of the condemned acreage. *Hance v. State Roads Comm'n, supra.* We conclude that the "standards enunciated in *Lustine* and in *Bergeman*" as applied to the facts by the trial court do not sustain the contention that it abused its discretion.

There is nothing in the holdings in *Smith v. State Roads Comm'n,* 257 Md. 153, 262 A. 2d 533 (1970), cited by the appellant which dictates a different result. In that case it was held that the trial court had not erred in a case involving a condemnation of a portion of a quarry when it excluded expert testimony which sought to spell out in detail the unit price of the mineral deposits (sand and gravel) in the condemned land and multiply that factor by the number of useable units of sand and gravel which would be lost by the taking, stating that such a method was "too speculative" and that the proper measure of valuation was the fair

---

7. The jury's evaluation of the weight to be given the testimony by the four expert witnesses was, of course, facilitated by its own view and inspection of the subject property.

market value of the land with its minerals, and not the minerals alone.

Additionally, as was pointed out in *Hance* and in *Adams*, "the appellant has singularly failed to show what substantial injustice has been done to it." There was no award of damages "in excess of the highest estimate calculated by the witnesses for the appellee. Neither did the verdict rest upon the 'untutored judgment of the property owner.'"

It was the jury's function to determine "whether the emphasis sought to be given in the facts in any of the testimony [by the experts] is correct, and they need not follow any witness' judgment as to the weight to be given to a particular factor in arriving at a valuation." *State Roads Commission v. Novosel*, 203 Md. 619, 625, 102 A. 2d 563, 566 (1954). *See also Lustine v. State Roads Comm'n, supra,* and *Bergeman v. State Roads Comm'n, supra.*

The holdings in *Congregation of St. Vincent de Paul v. Commonwealth*, 336 Mass. 357, 359, 145 N.E.2d 681, 682 (1957), and in *Brush Hill Dev. Inc. v. Commonwealth*, 338 Mass. 359, 367, 155 N.E.2d 170, 175 (1959), relied upon by the appellant, as we read them, are factually distinguishable. In the first such cited case the trial judge was held to have properly excluded evidence of a sale in a residential zone where the condemnees' property was located in a commercial zone.[8] In the *Brush Hill Development* case, there was held no abuse of discretion in excluding a comparable sale in a subdivision which had been approved for residential purposes where the subject property had not been so approved.

The appellant's reliance upon the holdings in *Comm. Redev. Agency v. Henderson*, 251 Cal.App.2d 336, 59 Cal. Rptr. 311 (1967), in *Urban Ren. Agency of Austin v. Georgetown S & L Assoc.*, 509 S.W.2d 419 (Tex. Civ. App., 1974) and in *City of Garland v. Joyce*, 462 S.W.2d 86 (Tex.

---

8. No sales of residential properties were submitted as "comparable" by either of the expert witnesses for the appellees. Although some such sales were included in their reports, objections to their admissibility were sustained.

Civ. App., 1970) is misplaced. In *Henderson* it was held to have been no abuse of discretion to have excluded evidence of sales made in a commercially zoned downtown business section since the property being condemned, although contiguous to that business section, was in a blighted area, zoned for residences, 95% of which had been constructed prior to 1919. In each of the Texas cases, that court held that a witness cannot "relate to the jury sales of tracts obviously not similar and then 'adjust' those sales and the prices paid to the opinion of the witness so as to call them 'comparable' ", and pointed out, in *Joyce*, that "the witness did not use the sales to arrive at an opinion of value; he used his opinion of value of the severed tracts to 'adjust' the prices paid on the sale in an attempt to make the sales 'comparable' ".

Obviously the appellant's witness Richards did not in his "adjustments" use the procedure condemned by the Texas court.

The salient observation made by Chief Judge Brune of this Court in *Mayor & City Council of Baltimore v. State Roads Comm'n*, 232 Md. 145, 151, 192 A. 2d 271, 275 (1963), when he stated: "[t]he appellants' main difficulty seems to be that the jury did not accept their appraisers' valuation" seems here particularly appropriate. *See also State Roads Comm'n v. Adams, supra,* at 385; *Greater Balto. Cons. Mkt. Authority v. Duvall, supra,* at 97.

## II

The appellant's next contention is that the trial judge committed prejudicial error and improperly afforded undue weight to one of the sales described as comparable during the testimony of the witness Richards. While describing a sale from the Hampton Park Corporation to James E. Boatman, et al. in 1971 of a lot containing 42,112.81 sq. ft. (.967 acres) which had sold for $75,000.00, counsel for the appellant objected and moved that reference to the sale be stricken because "the size of the subject is ten times as large as the sale and the zoning is different and it has all utilities.

I believe it is incomparable." The trial judge in overruling the objection, stated:

"THE COURT: I don't know. He hasn't testified as to the utilities. I feel that something an acre could be compared because the ten acres could be broken up into acre lots, if they wish. Under the circumstances I feel that the acre would be comparable and as stated before, I feel the zoning would be comparable enough zoning, so the Court will overrule the objection."

No objection was made to these remarks nor was there any motion to strike them or for a mistrial. Hence, the question is not properly before us. *See* Maryland Rule 885; *Dresbach v. State*, 228 Md. 451, 453, 180 A. 2d 299, 300 (1962). *See also Mezzanotte Const. Co. v. Gibons*, 219 Md. 178, 181-82, 148 A. 2d 399, 402 (1959).

We see the remarks of the trial court, however, as no more than a statement of the very logical reason given for the ruling made on the objection, coming as it did during the direct examination of the witness Richards when virtually every answer he gave was objected to on some ground or another on behalf of the appellant.

Although we see no prejudice in the remarks made, assuming arguendo that it did constitute error, it was dispelled by the clear and explicit instructions by the trial court to the jury when he stated:

"Any comment 1 may have made or that I make about the case is only for the purpose of procedure or clarification and any such comment or comments made by me or the tone of my voice or anything I may have said or done are not to be considered by you to show that I have an opinion as to the proper amount to be awarded in this case. Under no circumstances am I to influence your opinion as you the jury are to decide the award according to the evidence before you, of which you are the sole judges."

*See State Roads Comm'n v. Wyvill, supra,* 244 Md. at 171, 223 A. 2d at 149, citing *Nicholson v. Blanchette,* 239 Md. 168, 175, 210 A. 2d 732, 736 (1965) where the trial court after, examination, cross-examination and redirect examination of the appellant's expert witness, poignantly asked the witness why the subject property wasn't a "delightful project for a residential sub-division" and it was alleged that the trial judge thereby had expressed to the jury that in his opinion "the highest and best use of the property was for residential purposes." There — as we do here — it was held that the trial court's instruction dispelled any possible error.

### III

Although the appellant's third contention of error asserts that the trial court sustained "objections to questions upon cross-examination of appellees' appraisers, which sought to ascertain if they understood a relevant principle implicit in the statutory definition of 'fair market value,' " it is difficult to fathom from the appellant's disjointed argument whether it relates to rulings by the trial court upon the voir dire examination of the witnesses' qualifications to testify as experts, or whether it pertains to cross-examination of those witnesses pertaining to any enhancement in the value of the property as a result of the public project built.

Although "it is not incumbent upon this Court, merely because a point is mentioned as being objectionable at some point in a party's brief, to scan the entire record and ascertain if there be any ground, or grounds, to sustain the objectionable feature suggested," *see State Roads Comm'n v. Halle,* 228 Md. 24, 32, 178 A. 2d 319, 323 (1962), we shall review the cross-examination of both the appellees' experts to ascertain whether or not the appellant was precluded from cross-examining them in either facet of the case.

After counsel for the appellees in a voir dire examination of the witness John L. Richards established his qualifications as an expert, he was cross-examined as follows:

"MR. BRICE: Mr. Richards, what is the

definition, Maryland legal definition of fair market value?

"THE WITNESS: Fair market value is the highest price estimated in terms of money which a property will bring if exposed for sale on the open market by a seller who is willing but not obligated to sell, allowing a reasonable time to find a buyer who is willing but not obligated to buy, both parties having full knowledge of all the uses to which it is adapted and for which it is capable of being used.

"MR. BRICE: That is the Maryland definition of fair market value?

"THE WITNESS: That is an accepted national definition of fair market value. The other definition of fair market value which you are referring to is a partial taking. This being a full taking I did not use it. I am acquainted with the other definition, yes.

"MR. BRICE: Did you use the definition of fair market value as set forth in Article 21 Subsection 12 of the Maryland Code at the time you made your appraisal?

"THE WITNESS: This is a full taking. I believe you are referring to a partial taking.

"MR. BRICE: Did you use the definition of fair market value as set forth in Article 21 Section 12 of the Maryland Code at the time you made your appraisal?

"MR. LANCASTER: I object. That is a matter of law.

"THE COURT: The Court will sustain the objection. The Court of Appeals has said that an expert witness does not have to parrott the —

"MR. BRICE: I did not ask him to recite it.

"THE COURT: I know. There is an objection to going into the question of whether he used the Code or not. And it says as long as he gives what is material to fair market value the Court will determine that the definition that he gave is the

fair market value and it is not a question of whether it is Maryland or New York or Virginia. It does need to be Maryland requirement, I would say, and would meet the Maryland fair market value.

"MR. BRICE: I would *like to ask one more question.*

"THE COURT: All right.

"MR. BRICE: Mr. Richards, at the time you made your appraisal — strike that.

"Is your appraisal done under the premise and in contemplation of the definition of fair market value as set forth in Article 21 Subtitle 12 of the Maryland Code"

"MR. LANCASTER: I object, Your Honor. This is flaunting the Court.

"THE COURT: This Court will sustain the objection because there is no law that says he has to give the Code definition. It says whether it is a recognized definition recognized in Maryland. I would say what he gave is recognized.

"All right, sir.

"MR. LANCASTER: I submit the witness is qualified, Your Honor.

"THE COURT: I don't know that there are any further questions. *Are there any further questions?*

"MR. BRICE: *No, Your Honor.*

"THE COURT: All right."

Similarly, after the witness Adelbert W. Lee was examined concerning his qualifications, he was cross-examined as follows:

"MR. BRICE: What is the definition of fair market value?

"THE WITNESS: It is what—

"MR. BRICE: Can you do it without reading it?

"THE WITNESS: Yes, sir. I am not about to read it. Fair market value is what a willing purchaser

and willing buyer, both completely informed on values are willing to pay on the market free of any compulsion to either buy or sell.

"MR. BRICE: *I have nothing further.* I note an objection.

"THE COURT: What?

"MR. BRICE: Note an objection.

"THE COURT: Overruled." (Emphasis supplied.)

It is patent that the appellant's contention that it was precluded from being able to cross-examine either of the appellees' witnesses as to the definition of "fair market value" is frivolous. The answers given by each of the witnesses — as asked by the questions — certainly satisfied the general definition of "fair market value." If counsel for the appellant had other specific questions which he wished to address to each of the witnesses considering the statutory definition as set out in Code (1957, 1973 Repl. Vol.), Art. 21, § 12-106 (a), he was in no way precluded from addressing such questions to the witnesses, but he abandoned any further examination of them. Simply put, if he wished to inquire of the witnesses whether they recognized that in condemnation proceedings "any increment in value proximately caused by the public project for which the property [being] condemned is needed" should be excluded, in arriving at "the fair market value of the property being condemned," it would have been a simple enough proposition to have posed such a question.

The appellant also contends — as best we can understand it — that the appellees' expert witnesses failed "to realize that they were required to value the tract as though relocated Landover Road did not exist" and thus failed to exclude from their opinion of fair market value any "enhancement" in the valuation of the property as a result of the "public project" for which the condemned property was needed.

To properly understand what we see to be the objection in this regard requires the setting forth of the cross-examination of each of the witnesses as it was directed to this subject matter.

The witness Richards was cross-examined as follows:

"Q. Now, when you originally rendered your report regarding the value of this property you were under the mistaken belief that the Parker property *was on a corner*, were you not? A. *No, I was not under that mistaken belief.*

"Q. Do you have a copy of your letter dated July 8, 1974 directed to Mr. Miazga? A. Yes.

"Q. In the second paragraph of that letter, do you not state that 'Although the subject is converted in the appraisal process to square feet, it is acreage.' Do you say that? A. When it is sold as acreage it is listed in the tax sale as acreage.

"Q. You are saying it is acreage? A. Because I took it from the tax sale. But I converted it to square feet, which is the proper legal same area, the same amount of sand and pebbles.

"Q. Let me ask you this: Does that letter that you wrote say, 'Of the properties listed in the market data, five consist of 42,000 —' A. Where are you reading?

"Q. The second paragraph of that letter.

\* \* \*

"(The Witness) Let me see. The second paragraph?

By Mr. Brice:

"Q. Would you read the second paragraph, Mr. Richards? A. 'Of the properties listed in the market data, five consist of 42,112 square feet or less and are considered as parcels; ten consist of 45,000 square feet to 348,480 square feet, and this group is considered as acreage,' for tax purposes.

"Q. It doesn't say that, does it? A. I know, but I say it.

" 'Although the subject is converted in the

appraisal process to square feet, it is acreage' for tax purposes.

"Q. It doesn't say that either, does it? A. But I say it.

"And, 'Of course more sales containing a higher land area are desirable, but it is necessary to accept the sales which are available.'

"Q. More sales of a higher land area are desirable? A. Yes. I would have liked to have said all fifteen ten-acre sites if I could have got them, but I can't make them.

"Q. Now I would like you to turn, if you will, to Page 11 of your appraisal. Does your appraisal not say in the first paragraph on Page 11 that the land in its original shape and area is measured and computed as fronting — A. Wait a minute. I start —

"Q. Wait a minute now. A. The first section, I will catch up.

"Q. 'Without the benefit of accurate' — strike that.

"Does your appraisal not say in the first paragraph on Page 11:

" 'Without the benefit of an accurate survey, the land in its original shape and area is measured and computed as *fronting 680 feet on the westerly side of Landover-Largo Road, Route 202,* 550 feet on the south side of Central Avenue, Route 214; the west line as 880 feet and the south line is 580 feet.'

"Does your appraisal not say that?

"A. It says that, but —

"Q. All right.

"(Mr. Lancaster) Let him answer the question.

\* \* \*

"(Mr. Brice) The question was did it say that?

"(The Court) No, but he can —

"(Mr. Lancaster) I respectfully —

"(The Court) Excuse me. He is the expert. When you cross-examine an expert he is allowed to give the reason why he did something. You just don't cut him off with a yes or no. He is the expert in the case.

"You may answer it if you have anything to answer, but don't cut him off so sharp. You can't do that with an expert.

"(The Witness) *This land does go to the median strip there in 202, and that is the land we are appraising.* That is the land we are taking. And along that line it is 680 feet. It is right in the middle of Landover Road, the stakes you had put in there.

By Mr. Brice:

"Q. Isn't it a fact that you learned yesterday that this property was not on a corner? A. Oh, I knew that. The Roney property was in there. The Roney property was in between this property and 202. I was one of the ones that appraised the Roney property when the State took it.

"Q. I would like you to go to the bottom **paragraph of your original report. Does your** appraisal not say this:

" 'This land was formerly part of a farm and the present tenant has farmed this land. Access to the land is now from Central Avenue. With piping of the ditch, access could be from Route 202.'

"A. Yes, Under the police powers of the State Roads Commission, they could allow access from 202 in its present form. I couldn't take that across that man made ditch you put in there.

"Q. But at the time you were describing the property in your appraisal you indicated that it had access to 202. A. *I did not say that. It doesn't say that.*

"Q. It doesn't? A. Access to the land is now from

Central Avenue. With the pipe for the ditch access could be from 202, if you put a —

"Q. If you put a pipe in there. A. A drainage pipe, you can go over it.

"Q. Would you have had access to 202? A. Yes. There is already a road there.

"Q. And it was under that premise that you offered your estimated value of this property to be $3.00 a square foot? A. *No. I didn't. I never referred to that as a corner lot.*

"Q. All right. Let's go to the letter of July 8, 1974, the first letter in your appraisal. In the indented portion of the letter, which constitutes the last half of the first paragraph, do you not describe the property on the third line of that indented portion as:

" 'Southwest corner of Landover Road, Route 202 and Central Avenue, Route 214'?

"A. As I look up the road there, this property at the present when I appraised it was on 202. As a matter of fact, it is on the northern half of 202." (Emphasis supplied.)

In the cross-examination of the witness Lee, the following occurred:

"By Mr. Brice:

"Q. Mr. Lee, when did you receive this assignment to appraise this property? A. Sometime in April. My report was made April 17, but sometime in April, sir.

"(The Court) What year?

"(The Witness) This present year.

"By Mr. Brice:

"Q. April, 1974? A. Yes, sir.

"Q. And at the time you made your original appraisal you made it under the erroneous assumption that this property was located on a corner, which you later learned yesterday from

counsel that it wasn't on a corner? A. No, sir. I would like to correct that statement.

"I found great confusion in identifying this property. I have been an appraiser for the State Roads and for property owners on many, many occasions — in fact, some two or three hundred. Never in all of that experience have I found it impossible to get a take plat showing the outlines of the property.

"In this case I made inquiry of the right of way agent and I have a letter from him stating there was no such plat. And that, as I say, was the first time I had ever experienced that we didn't find it.

"I then examined the property from tax maps, and not only the current ones but back ones, to find what would be the outlines of this property. I also consulted the zoning map for the area, and found the zoning map portrayed the property as it actually is, *with the outlines of the Parker property going over what is proposed, or was then proposed to be the relocation of Route 202.*

"And on my appraisal report, I have a copy of the zoning map of that area showing that situation. It is what we call property having *sight visibility of the intersection of those roads.* But again, sir, I have had great difficulty in identifying just where this was because of insufficient records of the State Roads Commission.

"Q. Did you not say in your report that it is a ten acre parcel of land situated on the corner of Central Avenue and Landover Road? A. I did, sir.

"Q. Did you not say, in your appraisal, that:

" 'The subject property is an attractive and valuable parcel of land situated on the southeast corner of the intersection of Central Avenue and Maryland Route 202.'? A. That was *so identified.*

"Q. Did you not say that: . . . 'the property is zoned C-2 and is at a junction of important and heavily traveled state roads.'?

"A. Yes, sir. I checked the traffic count on this road both for current and for 1966 and found a very interesting record.

"Q. Now I would like to go, if you will — I would like to ask you to step down here for a second.

"Looking at Plaintiff's Exhibit 2, if you are able on that exhibit to locate the subject property.

"A. Yes, sir.

"Q. Are you able to locate it?

"A. I did, sir. I am pointing at Central Avenue, just west of the Largo Road, or 202." (Emphasis supplied.)

The law is plainly established that the fair market value of property condemned does not include or take into account any increment in value which may be proximately caused by the public project for which the property is being taken. *King v. Mayor & Council of Rockville*, 249 Md. 243, 251, 238 A. 2d 898, 903 (1968) citing *Big Pool v. State Roads Comm'n*, 245 Md. 108, 225 A. 2d 283 (1967); *Brinsfield v. Baltimore City*, 236 Md. 66, 202 A. 2d 335 (1964); 3 P. Nichols, Eminent Domain § 8.61 (3d ed. 1965); 4 P. Nichols, *supra*, § 12.21. *See also* Code (1957, 1973 Repl. Vol.), Art. 21, § 12-106 (a) [formerly Code (1957, 1967 Repl. Vol.), Art. 33A, § 6] now codified in Code (1975), Real Property Article § 12-105 (b).

It is obvious that there were no rulings made by the trial court during the cross-examination of either Richards or Lee that pre-empted any inquiry by counsel for the appellant concerning any enhancement in the value of the Parkers' property as a result of the highway project for which the acreage was being condemned. Although the witness Lee was examined about whether he had located the subject property "at the corner" of the two highways, and he responded that he had so geographically located and identified the property, no question was ever addressed to him concerning any enhancement in valuation.

In the rather detached, obtuse manner in which counsel for the appellant cross-examined the witness Richards he

first inquired as to whether or not the witness had "believed" that the property "was on a corner"; he then switched the subject matter of his examination to the contents of the witness' report concerning the acreage of the properties considered as "comparable sales." On return to the subject-matter the witness denied that he ever described the appellees' property as "a corner lot" and stated that he did not indicate that the property "had access to [Route] 202."

In another portion of the witness' cross-examination, he was asked whether or not he was aware that the State Highway Administration was acquiring the property for the construction of relocated Maryland Route 202 and a ramp from Central Avenue on to new 202. The witness, after stating that he was so "aware," replied that he had seen nothing in writing, had heard it by "word of mouth," but "the way the state changes its mind, you don't know what they are going to put in there." He finished his answer by stating "what the government intends to do with a piece of property has no bearing on the value of that property at the time of the trial." After then digressing to examine the witness concerning the sale "from Simplex to Boron [Oil Co.]," the appellant returned to the "public improvement" issue and the following occurred:

> "Q. Did you not just explain to us that when valuing a piece of property you are to disregard the public improvement that is being put in, it has no effect on value? I think you just said that. A. I just don't connect that.
>
> "MR. LANCASTER: I don't think he said that.
>
> "THE COURT: No, he didn't say that. He says he doesn't disregard the public improvement when he appraises the property for the purpose of getting a condemnation suit. I don't know what your question is.
>
> "MR. BRICE: That he does or does not?
>
> "THE COURT: In estimating the value of the land he doesn't consider the improvements that are

to be put in as being valuable to the land, but not that he doesn't consider them. I am trying to keep it straight because there is an objection. He didn't say he didn't consider them if the property is being condemned on a public improvement. I think that was the tenor of your question, the way I understood it. Maybe I am wrong. Maybe you can clarify it."

Instead then of undertaking to clarify his questioning in this regard — as suggested by the trial court — counsel for the appellant departed from this line of inquiry and asked the witness Richards whether he had "examined the neighborhood."

Our evaluation of all the cross-examination of the witness Richards leads to the conclusion that there were no rulings by the trial court which prevented the appellant from inquiring whether or not his valuation of the property included any increment in value resulting from the highway construction for which the property was being taken. He said it did not!

## IV

The final contention by the appellant is that the trial court failed to grant its instruction that comparable sales "can be viewed as primary or independent evidence of value." It argues that the failure to give the requested instruction "mandated a reliance upon the opinion testimony to the exclusion of such independent evidence of values."

After the jury had been instructed and counsel were invited to "approach the bench" for the noting of any exceptions, the following occurred:

"MR. BRICE: This is the plaintiff talking.

"I would except to the Court's failure to give the instruction of the plaintiff which reads:

" 'You are instructed that you are to determine the comparability of market sales offered in evidence in support of opinion testimony or as

independent evidence of value. You are further instructed that if you deem or find any such sale or sales to be particularly comparable to the subject property, then such sale or sales are the best evidence of value' ".

In ruling on that, and other exceptions taken by the appellant, the trial court stated: "It is the opinion of the court that the jury has been properly instructed and that most of what the plaintiff has taken exception to the court has covered in its own terms."

"It is settled law in this State that evidence of the price for which similar property in the vicinity has actually been sold may be used as *primary* evidence of the value of the property taken *or in support of and as background for* the opinion of an expert testifying as to the value of the property, *or both*." (Emphasis supplied.) *State Roads Comm'n v. Wyvill, supra*, 244 Md. at 172, 223 A. 2d at 150; *State Roads Comm'n v. Adams, supra*, 238 Md. at 378, 209 A. 2d at 247. See also *State Roads Comm'n v. Halle, supra*, 228 Md. at 32, 178 A. 2d at 323.

Although the record transmitted to this Court does not contain such a requested instruction as having been submitted to the trial court, we assume that such a request was before the lower court since in noting its exception counsel for the appellant apparently undertook to read verbatim a submitted instruction.

As framed, the requested instruction would have the court tell the jury "to determine the comparability of market sales [which were offered in evidence] *in support of* [the] opinion testimony *or* [which were offered] *as independent evidence of value*." Not being framed within the holdings in *Wyvill*, *Adams* or *Halle*, it did not request that the jury might consider evidence of the sales of comparable properties "as primary evidence of the value of the property taken" or consider such evidence "in support of and as background for the opinion" of the experts testifying, or consider "both."

If the appellant had desired to have the jury instructed in

accordance with the holdings in *Wyvill, Adams* and *Halle,* it would have been a simple enough matter to have prepared such a requested instruction with some preciseness. It is obvious that the nebulous nature of the proposal — being incomplete as a matter of law — would have done nothing in assisting the jury in connection with the evidence submitted to it of "comparable sales."

Additionally, it is noted that the appellant, by the second sentence in its requested instructions sought to have the jury told that if they found a "sale or sales to be particularly comparable to the subject property, then such sale or sales are the *best evidence* of value." No citation of authority is provided for this bald statement, and we know of none.

The first sentence in the requested instruction was imprecise, did not fully state the recognized principle of law and by syntax was most confusing. In our view there was no error in failing to grant it.

In its instructions to the jury, the trial court stated:

"Now, in considering the factual issues of the case you are to consider all of the evidence bearing on each issue regardless of whether the plaintiff or the defendant produced the evidence. I might also add that what you saw at the scene of the property when you visited the property is evidence to be considered by you, together with the other evidence offered in determining your award to the owner. In consideration of all the evidence you may relate your own experience and common sense and consider what you saw at the scene to test and weigh the correctness of the testimony given by the various witnesses.

"In condemnation cases it is proper for experts to testify as to the sale price of properties in the area similar to the property which is the subject matter of this case and to testify to such information which is generally termed comparable sales as a background for the expert's opinion in testifying as to the value of the property taken in the condemnation proceeding. Of course, it is for you to

determine to what extent such sales as were previously made in the area on which the experts base their opinions are similar to the property which is the subject matter of this proceeding, and you may determine the value of any such adjustments as you feel may be necessary because of any difference that you may find to exist between the sales of the property testified to and the land being taken in this case. As I previously stated, you are also to consider the testimony and exhibits and your view of the property in arriving at your verdict."

As we see it, the instruction given by the trial court to the jury fully and fairly covered the issue of comparable sales in the case and there was no requirement on its part to grant any specific requested instruction submitted by the appellant — assuming arguendo — that such proffered instruction would have, with precision, submitted to the jury a correct proposition of law. *See* Maryland Rule 554 b 1. *See also Aleshire v. State, Use of Dearstone,* 225 Md. 355, 370, 170 A. 2d 758, 765 (1961).

We find no error when the trial court denied the appellant's exception and refused to further instruct the jury as the appellant requested.

*Judgment of the Circuit Court for Prince George's County affirmed; costs to be paid by appellant.*