## STATE ROADS COMMISSION OF MARYLAND
### *v.* WYVILL, ET UX.

[No. 449, September Term, 1965.]

164

*Decided October 13, 1966.*

The cause was argued before HAMMOND, C. J., and HORNEY, OPPENHEIMER, BARNES and McWILLIAMS, JJ.

*Charles J. Sullivan, Jr., Special Attorney,* with whom were *Thomas B. Finan, Attorney General, Joseph D. Buscher, Special Assistant Attorney General,* and *Walter B. Dorsey, Special Attorney,* on the brief, for the appellant.

*Thomas A. Farrington,* with whom were *Hal C. B. Clagett, David A. Harkness, Sasscer, Clagett, Powers & Channing* and *Harkness & Ward* on the brief, for the appellees.

OPPENHEIMER, J., delivered the opinion of the Court.

This is an appeal from an inquisition of a jury in the Circuit Court for Calvert County in a condemnation proceeding. The appellees were the owners of a 107 acre property, used by them as a tobacco and grain farm. The farm included approximately 45 acres of cleared land, the balance being wooded. The improvements consisted of a two-story frame tenant house, three tobacco barns, a stable and a corn house. The appellant, the State Roads Commission, in constructing a new highway, acquired 4.18 acres of cleared land and 2.90 acres of woodland, for a total taking of 7.08 acres. None of the improvements was

affected by the the taking, although there were substantial cuts and fills across the entire frontage.

Mr. Jones, the expert appraiser for the appellant, testified that the highest and best use of the entire tract prior to the taking was as farm land. He was of the opinion that there was no appreciable resulting damage and placed a value of $500 an acre on the cleared land and $150 an acre on the woodland, making a total damage of $2,525. Mr. Vaughn, the appellees' expert, was of the opinion that the highest and best use of the property before the taking was for sub-division residential purposes. He valued the entire tract at $1,000 an acre, and testified that, in his opinion, the portion of the tract not taken had been damaged because of the substantial change in grade in certain portions. His valuation of the total damages by reason of the taking was $8,830. Mr. Wyvill, one of the appellees, testified that the best use of his land was for residential purposes. He placed a value of $2,000 an acre on the entire tract before the taking, and testified that the remainder of his land had been substantially damaged because of the cuts and fills which restricted the access to and from the portion of the tract not taken. The damages fixed by the jury in the inquisition were in the amount of $8,000.

The appellant contends, first, that the lower court erred in refusing to grant a continuance of more than 24 hours when the appellant's spokesman at the view of the property became incapacitated; second, that the judge below erred in refusing to grant a mistrial after an alleged expression of his opinion as to the highest and best use of the condemned property; third, that the court's instructions to the jury did not correct the prejudicial error previously committed; and, fourth, that the court erred in permitting the admission of evidence of value contained in a contract of sale of an adjoining property.

## I

After the opening statements, the jury was taken to see the property. In the viewing, the spokesman for the appellant was Mr. Kenchington, an employee of the State Roads Right of Way Department. Midway through the view of the property, Mr. Kenchington became ill and it became necessary for him

to leave the site before the completion of the viewing. The appellant's counsel informed the trial court that Mr. Kenchington would not be able to return to the courtroom to testify and moved for a continuance on the ground it would be prejudiced if forced to trial without Mr. Kenchington's testimony. Mr. Kenchington had stated during the viewing of the property that he would rebut certain statements made at the site by the property owner as to the grading of the property which existed prior to the taking. Judge Bowen granted a continuance for 24 hours but refused the appellant's request for a further delay. The judge did not question the fact that Mr. Kenchington was sick but stated that "any Right of Way man who is given sufficient time to familiarize himself with the property and Plats, could take his place."

On the following day, the appellant presented Mr. Shehan, another Right of Way agent, who interpreted the plat. While Mr. Shehan said that he was not familiar with the plats prior to construction, he admitted that he had used the road which intersected the property two or three times a week for the past nine years. The appellant then called Mr. Jones, its expert appraiser, who was familiar with the property as it existed prior to the construction of the road. He had seen the property before the taking and had examined all of the aerial photographs at the Soil Conservation office dating back to 1940.

The settled rule in this State is that the granting of a continuance is within the sound discretion of the trial court and will not be disturbed unless there was an abuse of discretion which was prejudicial. *Peddersen v. State,* 223 Md. 329, 337-38, 164 A. 2d 539 (1960) and cases therein cited. The record shows that Mr. Shehan, who took Mr. Kenchington's place, was thoroughly familiar with the property before the taking and clearly explained how the new road was related to the property after the taking as a result of the construction plan. Mr. Jones' testimony also evinced a thorough knowledge of the property before the taking. We find no abuse of discretion in the action of the trial judge in refusing a further continuance.

*Thanos v. Mitchell,* 220 Md. 389, 152 A. 2d 833 (1959), cited by the appellant, was a suit to recover damages for alleged medical malpractice. On the day set for the trial, the plaintiffs'

attorneys filed affidavits of two doctors in which they gave their opinions that one of the plaintiffs, Mrs. Thanos, was too ill to take the stand. It appeared that she would be available within a reasonable time. This Court held that the refusal of the trial judge to grant a continuance under these circumstances was reversible error. *Thanos* is clearly distinguishable on its facts.

## II—III

After the examination, cross-examination and redirect examination of Mr. Jones, the appellant's expert witness, Judge Bowen asked the following question:

"Well for the life of me I can't understand, Mr. Jones, why this piece of property isn't a delightful prospect for a residential sub-division. It has a stream running down through it, it rolls back from the highway in fold after fold of hills that look over top of each other to the stream. You say that that isn't choice residential development property? Why isn't it?"

Mr. Jones answered the judge as follows:

"Well I feel sir, that the cost of developing that property is going to be much greater than the cost of subdividing a property like Hunting Hills Estates or like some of the Parrack to Pritchard property if that were to be sub-divided, because when you have level land that has easy access it is easier to put in streets, you get more houses in a given area and the developers seek, in my observation at least, developers seek that kind of property first, because the more rugged property would, maybe, be second choice."

The appellant's counsel thereupon asked for a mistrial on the ground that the judge's question in effect had told the jury that, in his opinion, the highest and best use of the property was for residential purposes. The motion was denied.

In his instructions to the jury, Judge Bowen said:

"* * * I doubt very seriously if you can tell what the Court's opinion is, but assuming that you think you

can, you are to disregard that. What I think the case is worth or what questions I may have asked in the course of the trial, merely for the purpose of eliciting information for you gentlemen to consider, the Court's opinion of the value of the property is not before you at all and you are not to speculate by any gesture, question, inflection or grimace that the Court may have made during the course of the trial,—that the Court feels the case should be decided one way or the other. That is solely within your province and you gentlemen have the sole responsibility for determining damages."

The appellant contends that the important issue in the case was the highest and best use of the property involved; that the trial judge should have refrained from expressing any opinion as to the best potential use of the property and that the expression of his opinion in the form of the question to Mr. Jones was so prejudicial that it could not be corrected by his subsequent instructions to the jury. We disagree with these contentions.

As the Court said in *Dresbach v. State*, 228 Md. 451, 453, 180 A. 2d 299, 300 (1962) : "It is undoubtedly true that a trial judge because of his authoritative position should be exceedingly careful in any remarks made by him during the progress of the trial * * * to refrain either directly or indirectly from expressing an opinion on facts which should properly be left to the province of the jury." It is also true, however, that the judge "is not a mere moderator of a town meeting, submitting questions to the jury for determination * * *" and has the responsibility of endeavoring to see that the various issues involved are fully and fairly explained to the jury. *Western Md. Dairy Corp. v. Brown*, 169 Md. 257, 268, 181 Atl. 468, 474 (1935). The jury was familiar with the property and, like the judge, may well have wondered why its best use was not for residential purposes. Prior to the asking of the question, the testimony of the appellant's witness as to the best use of the property was only in the nature of a conclusion. The judge's question gave Mr. Jones the opportunity to give the reasons for

his conclusion and he did so in detail by referring to the rolling nature of the terrain, which would offer difficulties to developers in building a sub-division.

Even if there had been error in the judge's question, the error was dispelled by his clear and explicit instruction to the jury. *Nicholson v. Blanchette,* 239 Md. 168, 175, 210 A. 2d 732 (1965).

## IV

In his direct examination, Mr. Jones, the appellant's appraiser, testified that, in his opinion, the fair appraisal of the entire property before the taking was $48,300, of which the value of the land was $31,800. In arriving at his valuation of $500 an acre for the cleared land and $150 an acre for the woodland, Mr. Jones testified he had considered comparable sales in the vicinity. The first comparable sale to which he testified was one from Arthur King to Wareham and Craven. The King property was located about 500 feet south of the Wyvill property and was sold in June of 1959 for $50,000. Mr. Jones estimated the value of the improvements on the King property as $17,000, making the sales price of the land $226 an acre. He testified that, while the sale was made almost five years before the Wyvill condemnation proceedings, the King tract was quite similar to the Wyvill property in size, location, percentage of cleared land and improvements. He believed that the sale should be adjusted upward for time and downward because of the better location.

On cross-examination, Mr. Jones was asked whether there had been any recent sale of the former King property. He answered in the affirmative. The appellant's counsel objected because the question was directed to a contract of sale. Counsel for the appellees stated that the contract of sale had been recorded. The appellant's objection to the question was overruled. Mr. Jones thereupon testified that the property involved in the recent contract of sale was a portion of the valuable front section adjoining the Wyvill property on the south end. He testified further, over objection, that the sales price in the contract was $1500 an acre for 10 acres.

Later during the trial, Mr. Vaughn, the appellees' expert witness, testified, over objection, that the contract of sale of the

portion of the former King property was dated February 15, 1965. The trial took place in July of 1965, so that the contract referred to had been made approximately six months before. Mr. Vaughn, like Mr. Jones in the latter's cross-examination, testified that there were 10 acres, more or less, involved in the contract, to be determined by survey and that the price was $1500 an acre. Mr. Vaughn testified he was sure the sale would be consummated. Objections were duly taken to Mr. Vaughn's testimony as to the contract of sale and were overruled.

The appellant contends that all the testimony as to the contract of sale of the portion of the former King property in 1965 was improperly admitted and that this testimony materially prejudiced the appellant's case.

Counsel for the parties submit that there is no decision of this Court as to the admissibility in a condemnation proceeding of evidence of an unconsummated contract of sale of a property similar to the property condemned. We agree. It is settled law in this State that evidence of the price for which similar property in the vicinity has actually been sold may be used as primary evidence of the value of the property taken or in support of and as background for the opinion of an expert testifying as to the value of the property, or both. Much is left to the discretion of the trial court in deciding what sales are sufficiently comparable to be admissible. *State Roads Comm'n v. Adams,* 238 Md. 371, 378-79, 209 A. 2d 247 (1965); *Smith v. Potomac Electric Power Co.,* 236 Md. 51, 59, 202 A. 2d 604 (1964) and authorities therein cited. Evidence of an offer to purchase real property is not admissible to prove its value, *State Roads Comm'n v. Kuenne,* 240 Md. 232, 235, 213 A. 2d 567 (1965); "the value of an offer depends on too many considerations to allow it to be used as a test of the worth of property," *Horner v. Beasley,* 105 Md. 193, 197, 65 Atl. 820 (1907). But this Court has not passed upon the admissibility of a contract of sale of similar property either as primary evidence of the value of the condemned real estate or in support of the opinion of a testifying expert.

Nor do we find a general rule on the question emergent from decisions in other jurisdictions. Nichols, after stating the settled law that mere offers, whether made by the owner of the

condemned land or to him, are inadmissible, states: "Even a written contract for the sale of adjacent land is inadmissible, if the sale never took place, and is generally disregarded as evidence of value." 5 *Nichols, Eminent Domain,* Sec. 21.4[3]. 1 *Orgel, Valuation under Eminent Domain,* Sec. 148, makes a statement to the same effect. Nichols and Orgel cite the same four cases as authorities for the doctrine set forth in their texts. However, our examination of these cases does not persuade us that they should be taken as establishing the principle for which they are cited.

In *Crystal Lake Park Dist. v. Consumers Co.,* 313 Ill. 395, 145 N. E. 215 (1924), the first of the cited cases, the appellee, the condemning authority, had filed a petition for determination of the compensation to be paid the appellants, the property owners, for some 26 acres to be acquired for park use. In cross-examining one John Hoy, a witness produced by the appellants, the appellee developed that Hoy and two other men had an option from the appellants to buy the property sought to be condemned together with other property. No contract for the sale and purchase of the property had been signed. The appellants on redirect offered to prove that there had been a discussion among Hoy and his associates of the price to be paid and other matters in connection with the proposed contract. The trial judge sustained an objection to the proffer and on appeal his action was held not to be erroneous. The court said:

"The price of $160,000 included other lands, and it, as well as the evidence about the Mansion house, would have led to collateral inquiry about comparative value. Besides, there was nothing in the contract, by way of offer or otherwise, if it be considered as an offer, that would be of any value to the jury in the valuation of the premises sought to be condemned. The contract was not an executed contract, and the evidence as to discussions, sought to be brought out by the appellants' counsel, was improper. His inquiry was as to what was said about values, etc., in discussions leading up to the making of the option or the contract." *Id.* at 404, 145 N. E. at 218.

The testimony proffered seemed to relate to what, in effect, was an offer and not to an executed contract of sale. Moreover, it is not clear whether the land which was the subject of the discussion was the condemned land itself or similar land or a combination of both.

In *Suburban Land Co. v. Town of Arlington*, 219 Mass. 539, 107 N. E. 432 (1914), the land condemned for park and water purposes was part of a large tract purchased by the appellant for sub-division development. The appellant had entered into contracts of sale of lots which were part of the original large tract in which the condemned land was located; these lots had been sold on installment contracts under which, at the time of the condemnation proceedings, payments were still being made by the purchasers. The trial court excluded evidence as to the aggregate contract price to be paid for the lots which had been sold under the unconsummated installment arrangements and the Supreme Judicial Court of Massachusetts held that the evidence was properly excluded. The court said:

> "The agreements under which the petitioner disposed of its land did not constitute sales, such as are admissible in evidence to show market value. And as a test of value, we are not inclined to say that the price which is established artificially and temporarily by booming methods should be regarded as equivalent to the market value which is regulated by the natural laws of supply and demand." *Id.* at 541, 107 N. E. at 433.

The decision seems to rest in large part on the court's finding that the contracts for the sale of the other lots by the developer were not evidence of market value because of the nature of the sales as part of a high pressure selling campaign.

Irrespective of the rationale of the *Suburban Land Company* case, however, its authority seems questionable under a later decision of the same Massachusetts court. *Brush Hill Development, Inc. v. Commonwealth*, 338 Mass. 359, 155 N. E. 2d 170 (1959), like *Suburban*, involved the condemnation of a portion of a tract bought by the appellant some years before for development. In the *Brush Hill* case, the Massachusetts Su-

preme Judicial Court stated that testimony of the appellant about existing purchase and sale agreements covering portions of the land taken, excluded by the trial judge, was competent on the issue of value. The court said:

"This court, of course, in the past has not approved the admission, as evidence of fair market value, of testimony concerning executory purchase and sale agreements, covering comparable land not taken, even though such contracts of sale (if genuine and not contrived as evidence for the occasion) may reasonably be regarded by real estate experts and practical businessmen as helpful indications of such value. See *Chapin v. Boston & Providence R.R.* 6 Cush. 422, 424; *Suburban Land Co. Inc. v. Arlington,* 219 Mass. 539, 541. We need not now reconsider these two decisions or determine whether possible infirmities in such testimony (such as alleged lack of a genuine transaction) should not more reasonably go to the weight of the testimony than to its competency. The situation is very different with respect to binding agreements of purchase and sale of the very land taken, which constitute more than unaccepted offers, as in *Peirson v. Boston Elev. Ry.* 191 Mass. 223, 232-233, or options, or contracts based upon so many contingencies as to be meaningless on the issue of fair market value. Such testimony about executory contracts of sale, absolute in terms, relating to the very land taken, is much more directly relevant than if it concerned neighboring or comparable land." *Id.* at 364-65, 155 N. E. 2d at 174.

We shall subsequently discuss the distinction made between the exclusion of testimony as to executory contracts of sale relating to the land taken and similar testimony in respect of comparable land. *Brush Hill Development,* however, does not affirm *Suburban* but, on the contrary, questions whether the objections to the testimony as to contracts of sale, even of comparable land, should not go to the weight of the testimony rather than to its competency.

*In re Simmons,* 68 Misc. 65, 124 N. Y. S. 744 (Sup.Ct. 1910),

holds only that the commissioners in a condemnation proceeding properly excluded testimony as to an alleged contract of sale made by the former owner of the property involved, when the former owner was dead and the contract itself had been lost. The decision, in our opinion, goes to the failure of proof of the existence and contents of the alleged contract rather than to the admissibility of the contract itself. *Ottawa, O. C. & C. G. R. Co. v. Adolph,* 41 Kan. 600, 21 Pac. 643 (1889), the last of the four cases cited by Nichols and Orgel, holds that evidence of a former agreement by the owner of the property condemned to sell it to the condemning railroad was improperly excluded even though the agreement was never consummated. The case is not in point.

Several recent decisions have held that evidence of a contract of sale for similar land is admissible. *State v. Clevenger,* 384 S. W. 2d 207 (Tex. Civ. App. 1964) *application for writ of error refused; People v. Kawamoto,* 230 Cal. App. 2d 18, 40 Cal. Rptr. 685 (1964). In *Clevenger,* evidence of such a contract was held to have been properly admitted, even though the buyer thereunder forfeited the escrow deposit and the contract was not consummated. The evidence that the contract for the sale of the comparable land was entered into by both parties in good faith was undisputed. The court distinguished cases holding mere offers inadmissible and held that the contract was more than an option. The opinion incorporates by reference decisions from other jurisdictions to the effect that the modern trend in the law of evidence favors both a liberal rule of admissibility and the giving of a broad discretionary control to the trial judge. In *Kawamoto,* the ruling of the trial judge in admitting evidence of two agreements for the sale of comparable land was affirmed, although one agreement had not yet been consummated and there was an indication that the other agreement would be rescinded. The authorities relied on in both *Clevenger* and *Kawamoto* indicate that the evidence is admissible in support of the expert's opinion. However, if executory contracts of sale are sufficiently reliable to be admissible for that purpose, it would seem that, subject to the trial judge's discretion, they may be sufficiently reliable to be admissible as independent evidence of the value of the land taken. See *State*

*Roads Comm'n v. Adams, supra* and *East Orange v. Crawford,* 78 N. J. Super. 239, 244-46, 188 A. 2d 219, 222-23 (1963).

A number of cases have held that the price fixed in an unconsummated contract of sale entered into before the condemnation by the owner of the condemned property with a third person is admissible as substantive evidence of the value of the property. *Wolff v. Commonwealth of Puerto Rico,* 341 F. 2d 945, 947 (1st Cir. 1965); *United States v. Certain Parcels of Land in City of Philadelphia,* 144 F. 2d 626, 629-30 (3d Cir. 1944); *Virgin Island Housing Auth. v. 15.5521 U. S. Acres of Land,* 230 F. Supp. 845, 848-49 (D.V.I. 1964); *Brush Hill Development, Inc. v. Commonwealth, supra; East Orange v. Crawford, supra; In re Hamilton Place,* 67 Misc. 191, 122 N. Y. S. 660 (Sup.Ct. Spec. Term 1910), *app. dis.* 143 App. Div. 302, 128 N. Y. S. 283, *aff'd,* 202 N. Y. 607, 96 N. E. 1116. The rationale of these decisions is well expressed in *City of Philadelphia, supra,* as follows:

> "We are, therefore, of the opinion that the evidence of the terms of the contract of sale for the property condemned in the present case should have been received in evidence * * * It is true that the contract had not been consummated and that, as argued by the government, reception of such evidence makes it possible for a landowner, learning that condemnation of his property is likely, to enter into a collusive agreement of sale so as to manufacture evidence in support of an exorbitant claim. This danger is not to be minimized, particularly in view of the difficulty which might well be entailed in proving such collusion. Yet evidence of a bona fide sale, otherwise relevant, should not be excluded because of the possibility that some landowner might conspire with another to defraud the government by manufacturing collusive evidence. Such objections go to the weight of such evidence rather than to its admissibility, and the trial affords opportunity, both by cross-examination and comment to the jury, to bring such evidence to its proper perspective

for the jury's consideration. The penalties of the criminal law also will afford a deterrent to such persons without depriving others of significant evidence of the value of their property in condemnation proceedings." 144 F. 2d at 629-30.

The reasons for the admissibility of prior contracts made by the owner of the condemned property may well be applicable in considering the question of the admissibility of contracts of sale for comparable properties. The chances of fraud seem to be no greater; two strangers to the condemnation litigation are involved instead of one. It is true that as to a prior contract for the sale of the condemned land the owner is generally on the stand, subject to cross-examination, but the way is always open to opposing counsel to attack the bona fides of contracts as to comparable lands. Modern pre-trial discovery procedure, properly used, affords opportunity for the investigation of any such contracts which will be offered in evidence. Unlike offers and options, contracts for the purchase of land are binding obligations, not lightly ignored; the fact the contracts have not progressed into sales seems to go to the weight of the evidence rather than to its sufficiency.

However, the question of the admissibility of testimony on direct examination as to contracts of sale of comparable land as evidence of the value of the condemned land is not before us and we do not decide it. In this case, the testimony was adduced on cross-examination of the appellant's expert witness. That witness had based his opinion of value, in part, upon a comparable sale made five years before. Under cross-examination, he admitted there was a recorded contract of sale for a portion of the same property, adjacent to the tract involved in the condemnation, entered into less than six months before the proceedings. The price per acre was substantially higher than that in the preceding sale. No question was raised as to the good faith of the execution of the contract. On these facts, even assuming that the evidence as to the contract would not have been admissible on direct examination, we hold that the testimony was properly admitted on cross-examination, as a test of the witness's opinion by reference to facts of which he was aware and to weaken the force of his direct testimony.

This Court has held that "it is peculiarly appropriate to permit cross-examination as to the reasons for an expert's opinion." *Plank v. Summers,* 205 Md. 598, 607, 109 A. 2d 914, 918 (1954). The rule limiting cross-examination to the points on which the witness testified on direct "does not go to the extent of restricting the cross-examination of the witness to the specific details inquired into on direct examination, but permits full inquiry into the subject matter entered into." *Williams v. Graff,* 194 Md. 516, 522, 71 A. 2d 450, 452-53 (1950). These general principles pertaining to the scope of cross-examination have been applied in other jurisdictions to situations closely analogous to the present case.

In *Templeton v. State Highway Comm'n,* 254 N. C. 337, 340-41, 118 S. E. 2d 918 (1961), it was held that the lower court committed prejudicial error in not permitting cross-examination of an expert witness in a condemnation proceeding with respect to sales prices of nearby property to test his knowledge of values and for the purpose of impeachment, even though evidence as to comparable sales was not admissible for the purpose of fixing value. *State Highway Comm'n v. Daniels,* 235 Miss. 185, 108 So. 2d 854 (1959), is to the same effect. The court held that while the record prices paid for other lots could not be stated, evidence as to the price of similar land was admissible to weaken opinion values. In *People v. Wasserman,* 50 Cal. Rptr. 95, 106-07 (Cal. App. 1966), the lower court, in a condemnation case, had held that evidence of a right-of-way contract, signed by the owner of the property, was inadmissible as direct testimony because the contract had not been completely executed but that an expert witness could be cross-examined about the contract. On appeal, the trial court's judgment was affirmed. The appellate court said:

"A wide latitude should be allowed in the cross-examination of expert witnesses as to value for the purpose of testing their knowledge, judgment, bias and the validity of their opinions."

The testimony as to the contract of sale having been properly admitted on cross-examination, there was no reversible error in subsequently permitting the expert of the property owners to testify to the same effect. That witness testified he was confident the sale would be consummated and so corroborated

the bona fides of the contract, whose execution had been used to weaken the testimony of the appellant's expert. The evidence as to the contract having been previously properly introduced in cross-examination, the later reference to it by another witness in giving his reason for his expert opinion was not prejudicial to the appellant. See *Baltimore & Ohio R. R. Co. v. Zapf,* 192 Md. 403, 412, 64 A. 2d 139 (1949) and *Peisner v. State,* 236 Md. 137, 145, 202 A. 2d 585 (1964).

*Judgment affirmed; costs to be paid by appellant.*