## ARTHUR W. MELESKI ET AL. v. PINERO INTERNATIONAL RESTAURANT, INC.

[No. 137, September Term, 1980.]

*Decided January 20, 1981.*

The cause was argued before MELVIN, WILNER and COUCH, JJ.

*Jervis S. Finney,* with whom were *Ober, Grimes & Shriver* on the brief, for appellant Chas. H. Steffey, Inc. *Jerome F. Connell, Sr.,* with whom were *Connell & Clinton* on the brief, for appellants Arthur W. and Elizabeth J. Meleski. *Michael Demyan* on the brief for appellant John S. Collins.

*Martin J. Snider,* with whom were *Manis, Wilkinson & Snider,* Chartered on the brief, for appellee.

MELVIN, J., delivered the opinion of the Court.

This case involves questions of partnership law, more particularly the liability of a partnership and its individual members to a non-partner for compensatory damages and punitive damages resulting from an alleged fraud practiced upon the non-partner by the partners in connection with a contract for the sale of a liquor license. To understand the precise issues presented it is necessary to set out in considerable detail the procedural history of the case below, tried before a jury in the Circuit Court for Anne Arundel County on special issues pursuant to Maryland Rule 560.

On June 21, 1974, a partnership known as Fort George Associates and Elizabeth J. Meleski, "parties of the first part, vendors," entered into a written "Agreement of Sale" with "International Restaurant, Incorporated, Maryland Corporation, second part, Vendee." The agreement contained the following recitals:

> "Whereas the Vendors are the owners and possessors of a certain Class B liquor License issued by the Board of License Commission of Anne Arundel County for the premises known as 1630-32 Annapolis Road, unto Elizabeth J. Meleski trading as Butch's Beef and Beer, and
>
> Whereas, the Vendee is the tenant of the adjacent property known as 1634 Annapolis Road, Odenton, Maryland and does intend to re-open the restaurant and tavern business on the said premises and
>
> Whereas, the Vendees [sic] do desire to transfer their interest in the said Class B Liquor License and the said Vendees do desire to acquire and purchase the Vendors said interest, these premises are made."

The agreement then provided that the vendors "do hereby bargain and sell and transfer and assign all their right, title

and interest in and to the Class B Seven Day Liquor License *owned by them* unto the said Vendee at and for the purchase price of Twelve Thousand Five Hundred Dollars ($12,500). . . ." (Emphasis added). The purchase price was to be paid in monthly installments over a three year period and if the vendee failed to make any monthly payment within ten days of its due date "the whole balance" became "due and collectable at once." The agreement also provided that the vendors would "assist in any and whatever the Vendees in the matter of the *transfer of the said License* to them including whatever assistance it may render at the hearing before the Zoning Hearing Officer for Special Exception and before the Board of License Commissioners for the transfer of the said license." (Emphasis added).[1]

The agreement was signed on behalf of the partnership by one of the partners, John S. Collins. Collins was the managing partner and the attorney for the partnership. The agreement was also signed by Elizabeth Meleski individually, apparently in her capacity as the individual to whom a Class B liquor license had been issued in connection with the operation of the restaurant known as Butch's Beef and Beer. There was testimony, however, that the partnership, Fort George Associates, was "in fact" the owner of the liquor license. It seems that sometime in 1971 or 1972 Mrs. Meleski and her husband, Arthur Meleski, had bought into the partnership consisting of John S. Collins and Chas. H. Steffey, Inc. The partnership owned the property on which Mr. and Mrs. Meleski operated Butch's Beef and Beer restaurant, but at the time of the agreement, the restaurant had been closed since April 30, 1973, and, according to Mr. Meleski, the building was demolished two or three months after the restaurant was closed "due to the fact that we [the partnership] were going to build motels in the back." The motel was under construction in April 1974. Apparently, the

---

1. As a condition precedent to the regular use of any premises for the sale of alcoholic beverages, the Anne Arundel County Zoning Regulations in effect at the time required that a Special Exception therefor be granted. The issuance or transfer of a liquor license was also subject to the approval of the County Liquor Board.

original building plans for the motel did not include a restaurant and there was testimony that the partnership considered it advantageous to have an operating restaurant with a liquor license next door as a convenience to the motel's guests.

The agreement was signed on behalf of the vendee, International Restaurant, Incorporated, by its president, Antonio Pinero. Mr. Pinero is a native of Cuba. He came to the United States in 1957 and became a U. S. Citizen in 1966. Prior to coming to Anne Arundel County he and his wife had operated, successively, small restaurants in Pennsylvania, Delaware and Washington, D. C. He said that in 1973 when "we lost our lease" to the premises where his Washington, D. C. restaurant was located, he and his wife sought another restaurant location. They were unsuccessful in their search until, in April 1974, they came to Anne Arundel County in answer to a newspaper advertisement that the English Company had a restaurant for rent. The restaurant was immediately adjacent to the property owned by the Fort George Associates partnership where Butch's Beef and Beer restaurant had been operated.

Before signing a lease with the English Company, Mr. Pinero, in early April, 1974, contacted Mr. Collins whose name had been mentioned to him as one who had a liquor license for sale. Collins told him of his (Collins') association with Fort George Associates and that the partnership had a license they would transfer to him. According to Pinero, after the $12,500 price was verbally agreed upon, he asked Collins why he couldn't "just get a new one" rather than pay $12,500 for the transfer. Pinero said Collins replied that there was a "moratorium" on the issuance of new licenses and that "you have to buy an existing license." Pinero testified that he regarded Collins as his lawyer in connection with all the "paperwork" necessary to the obtention of the transfer of the license, including the formation of International Restaurant Corporation to receive it, the preparation of the June 21, 1974 agreement of sale, and representation before the Anne Arundel County Zoning Hearing Officer and the County Liquor Board. He testified

that although he had owned a beer license in connection with his restaurant in Washington, D. C., he "didn't have any knowledge" of the liquor laws or "the different classes of licenses that existed in Anne Arundel County."

On September 7, 1977, the partnership (then consisting of Mr. and Mrs. Meleski and Chas. H. Steffey, Inc. — Mr. Collins having retired as a partner in 1976 — and Mrs. Meleski filed suit against International Restaurant Corporation.[2] The declaration alleged the existence of the June 21, 1974 written agreement of sale and that International had "wrongfully breached the contract by failing to pay" a balance claimed to be due on the purchase price of the liquor license they had sold to International. International had a perfect defense to this suit: the Class B liquor license that the plaintiffs purportedly owned and for which they sought payment from International did not exist on June 21, 1974. Although a valid Class B license had at one time been owned by the plaintiffs-vendors, it had been allowed to expire on April 30, 1974, after Butch's Beef and Beer restaurant had ceased to operate. Thus, when these admitted facts became known to the court, at a pre-trial hearing, International's motion for Summary Judgment was granted as to the plaintiffs' claim for payment.

In the meantime, International had filed in the proceedings a counterclaim against the original plaintiffs for fraud and deceit. It alleged that the counter defendants were partners in Fort George Associates and claimed a judgment against them "jointly and severally" for compensatory and punitive damages. International also filed in the proceeding what it called a "Third-Party Claim" against Mr. Collins seeking the same damages for the same fraud alleged in the counterclaim, i.e., that the partnership acting through one of the partners (Collins) falsely and fraudulently represented to International that the partnership owned a valid liquor

---

2. The named defendant was actually "Pinero International Restaurant, Inc." but the pleadings were amended by interlineation on October 3, 1978, to reflect "International Restaurant Corporation" as the apparently correct name of Mr. Pinero's corporation. We hereafter refer to the Corporation as "International."

license "with the intent to deceive and defraud Third-Party Plaintiff to pay valuable consideration for a non-existent commodity." A separate count of the "Third-Party Claim" also sought damages against Mr. Collins for an alleged breach of duty owed to International as its attorney.

The case went to trial by jury on International's counterclaim and "Third-Party Claim" and the general issue pleas filed thereto. At the close of the evidence, various issues were submitted to the jury pursuant to Md. Rule 560 with instruction from the court. Based on the jury's answers to the issues submitted, the docket entries show that the following judgments were entered on October 2, 1979:

> "Judgment Absolute extended for the Counter-Plaintiff, Pinero International Restaurant, Inc., against the Counter-Defendant, Arthur W. Meleski, in the amount of $4,068.00 compensatory damages and $11,250.00 punitive damages ($15,318.00); for the Counter-Plaintiff, Pinero International Restaurant, Inc., against the Counter-Defendant, Elizabeth J. Meleski in the amount of $4,068.00 compensatory damages and $11,250.00 punitive damages; in favor of Counter-Plaintiff, Pinero International Restaurant, Inc., against the Counter-Defendant, Charles H. Steffey, Inc., in the amount of $4,068.00 compensatory damages and $22,500.00 punitive damages, and in favor of the Third-Party Plaintiff, Pinero International Restaurant, Inc., against the Third-Party Defendant, John S. Collins, in the amount of $4,068.00 compensatory damages and $22,500.00 punitive damages, jointly and severally and as partners in Fort George Associates, Inc."

All of the partners (Mr. and Mrs. Meleski, Chas. H. Steffey, Inc. and John S. Collins) joined in filing a single notice of appeal. One brief was filed on behalf of all appellants.[3] We shall consider the questions presented in the

---

**3.** At the trial below, the Meleskis, Chas. H. Steffey, Inc. and Collins were represented by separate counsel.

chronological order in which the alleged errors of the trial court occurred.

## I

Appellants contend that the court erred in granting summary judgment to International on the partnership's original suit for breach of the June 21, 1974 agreement. Their argument here is that at the time the motion was granted there was evidence before the court from which it could be inferred that the original agreement had been changed by the parties and that International was indebted to them under the alleged new agreement or "novation." The difficulty with this argument is that the appellants elected to sue on the original written agreement, claiming that International owed them a balance on the purchase price of a liquor license that they allegedly owned and had sold to International for $12,500. There is no indication or contention that they ever sought to amend their declaration to allege any other agreement. Having conceded to the court in oral argument that at the time of the written agreement on which their suit was based they had no liquor license to sell, it is difficult to comprehend how they could expect to recover its "selling" price from International. The Summary Judgment was properly granted. Md. Rule 610.

## II

During the course of appellant Collins' testimony at trial, the trial judge asked him a number of questions. No objection was made to any of the questions as they were being asked by the judge, but shortly thereafter counsel for Chas. H. Steffey, Inc. asked the court to "tell the jury to disregard the questions and responses" on the grounds that the judge "clearly cross examined him [Collins]" and "inevitably influenced the jury and prejudiced the jury." Counsel for the Meleskis said that "the Court far exceeded its scope of examination . . .", and counsel for Collins complained that "the way the questions were brought out, I think that the jury could have surmised that something important was being brought out that wasn't brought out before,

yet it was brought out in such a way that it was indication to them to the prejudice of the defense in this case that it — it had more importance than it actually had." The record does not show that either of these counsel asked the court to take any action.

On appeal, appellants contend that "the court below erred in refusing to grant an immediate instruction to the jury, or a mistrial, upon its hypercritical interrogation of John S. Collins." They assert that the court's "questions were unsettling, belittling and overbearing" and that "the prejudicial impact was ... irreparable." We find no reversible error. First of all, none of the appellants asked for a mistrial. That issue is therefore not before us. Md. Rule 1085. Moreover, even though some of the court's questions may have elicited answers that were harmful to the appellants' case, we do not think that the questions were unwarranted under the circumstances. In any event, even if there had been error in any of the questions, the error was dispelled by the judge's instructions to the jury at the close of the case:

> "You should not conclude from any conduct or words of mine that I favor one party or the other or believe or disbelieve the testimony of any witness. You and not I are the sole judges of the believability of the witnesses and the weight of the evidence. And you must not be influenced in any way by my conduct during the course of the trial. I sometimes ask questions during a trial because I'm not clear about a witness's testimony on certain points. You should not infer that this ... you should not infer that these matters are more important than others I did not ask questions about. I was merely seeking clarification. Even should you conclude that I may have come to certain conclusions of my own, you will not speculate as to what those conclusions are. I'm not a juror and I have no function in your deliberations in deciding the facts and applying the law. You are the ones who must decide the case."

*See State Roads Comm. v. Wyvill,* 244 Md. 163, 170, 223 A.2d 146 (1965); *Nicholson v. Blanchette,* 239 Md. 168, 175, 210 A.2d 732 (1965).[4]

## III

Appellants contend that "the court erred in refusing to direct verdicts for appellants on the issue of fraud, punitive damages, and the statute of limitations."

### (a) *Fraud*

The appellants, citing Section 9-305 of the Corporations and Associations Article (Ann. Code of Md. 1975),[5] concede in their brief "that if fraud is established against one partner, the partnership (and thus all partners) are liable for that fraud. . . ." With this correct concession, and in view of the absence of any real argument concerning the sufficiency of the evidence of fraud as to one of the partners (Collins), we find no merit to appellants' contention that a directed verdict should have been granted in favor of any of the appellants. The issue was clearly one for the jury to determine on the conflicting evidence and inferences therefrom.

### (b) *Punitive Damages*

As we understand the appellants' argument here, it pertains only to the Meleskis and Chas. H. Steffey, Inc. It is argued that the jury should not have been permitted to consider punitive damages against the Meleskis and Chas. H. Steffey, Inc. because there is no evidence that they individually "authorized, participated in, or ratified the

---

4. We do not intimate that in all circumstances a trial judge's prejudicial conduct can be cured by instructions at the end of the case. Depending on the circumstances, there may be cases where a judge's conduct is so prejudicial as to be irreparable. The instant case is not one of those cases.

5. "§ 9-305. *Partnership bound by partner's wrongful act.*
　　Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership, or with the authority of his copartners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act. (An. Code 1957, art. 73A, § 13; 1975, ch. 311, § 2.)"

malicious act." This argument is without merit for two reasons.

First, there is evidence in the case from which the jury could have found that the Meleskis and Chas. H. Steffey, Inc. did authorize, or at least ratify, the action of Collins in entering into the alleged fraudulent agreement of June 21, 1974 to "sell" the non-existent liquor license. By his own testimony, Mr. Meleski read the agreement before it was executed and authorized his wife to sign it. He also testified that Mr. John Steffey, chairman of the board of Chas. H. Steffey, Inc., was "aware" the agreement "was coming into existence." There was also evidence from which the jury could have found that after the execution of the agreement the partners accepted, indeed insisted upon, payments from the appellee with full knowledge that the liquor license they had "sold" him did not exist.

Secondly, it is uncontroverted that in executing the agreement on behalf of the partnership Collins was acting within the scope of the business of the partnership. His allegedly fraudulent conduct in inducing the appellee to enter the contract was, then, a partnership act, and if as a consequence he is liable for punitive damages, so too are the partnership and all other partners — regardless of whether or not there is any affirmative proof that any of the other partners authorized, participated in or ratified his tortious conduct. Although we recognize there is authority to the contrary in other states,[6] we think the rule in Maryland is as we have stated it.

In *Schloss v. Silverman,* 172 Md. 632, 192 A. 343 (1937), the Court of Appeals stated the general rule of liability of a partnership and its several members for the torts of any of its members:

> "The liability of one copartner for the tortious acts of another is analogous to the liability of a principal for the acts of his agent, since each

---

**6.** *See e.g.* Broudy-Kantor Co. v. Levin, 135 Va. 283, 116 S.E. 677, 32 A.L.R. 249 (1923); Wright v. E. Z. Finance Co., 267 S.W.2d 602 (Tex. Civ. App. 1954).

partner acts both as principal and as the agent of the other as to acts done within the apparent scope of the business and purpose of the partnership and for its benefit. 1 *Rowley on Partnership,* secs. 509, 485; 47 C. J. 884; 20 R. C. L., *Partnership,* secs. 94, 126. The test of the liability of the partnership and of the several members thereof for the torts of any one partner is whether the wrongful act was done within what may be reasonably found to be the scope of the business of the partnership and for its benefit (*Ibid; Cooley on Torts,* sec. 88), and the scope of the authority of a partner is determined by the same principles as those which measure the scope of an agent's authority." 172 Md. at 638.

The Court then went on to recognize that there is authority for the proposition that this general rule "is not applicable to the liability of one partner for the willful and malicious torts of another (*Cooley on Torts,* sec. 88), because such torts cannot be considered as within the usual scope of partnership business." *Id.* at 638. The opinion makes clear, however, that if a tort is "willful and malicious" [and therefore one for which punitive damages may be awarded] and *is* committed within the scope of the agency, the non-participating partners are equally liable.

"... But it is not altogether certain that the general rule is not applicable to such cases, because the conclusion that willful and malicious wrongs are not within the scope of an ordinary partnership may be a mere factual inference. The case of *McIntyre v. Kavanaugh,* 242 U.S. 138, 139, 37 S. Ct. 38, 39, 61 L. Ed. 205, cited as in apparent conflict with the rule that willful and malicious torts are not to be considered as within the usual scope of the business of an ordinary partnership, does not go as far as that. The court there was dealing with a case in which a partnership engaged in business as brokers wrongfully converted certain securities. Thereafter the firm and its members were adjudged

bankrupts. The depositor then sued one of the partners, who pleaded his discharge, personal ignorance of and nonparticipation in any tortious act. The court there said: '*That partners are individually responsible for torts by a firm when acting within the general scope of its business, whether they personally participate therein or not, we regard as entirely clear.* ... If, under the circumstances here presented, the firm inflicted a willful and malicious injury to property, of course, plaintiff in error incurred liability for that character of wrong.' That case turned upon the fact that the tort was actually within the general scope of the partnership business, and is not inconsistent with the rule that a willful and malicious tort is not within the usual scope of an ordinary partnership. *If the tortious act is a partnership act, it must also be severally the act of the partners;* but if it is willful and malicious, and done by one of the partners without the knowledge or consent of the others, *and not for the benefit or purposes of the partnership,* it will not be considered as within the usual scope of an ordinary business partnership. In the case last cited the partnership received the securities, and the partnership appropriated them wrongfully to its use, sold them, deposited the proceeds to its credit, and used them as its funds. That those transactions were partnership business was not a matter of inference, but was shown by direct and unequivocal proof. But whether regarded as an exception to the general rule, or as a mere application of it to appropriate facts, the weight of authority supports the view that, where one partner commits a willful and malicious tort *not within the scope of the agency or the common business of the partnership,* to which the other members have not consented, and which has not been ratified, they are not liable for harm thereby caused. ... [Citations omitted]." (Emphasis supplied). *Id.* at 638, 639.

In *Schloss,* the Court found no liability against a partnership and the non-participating partners for the tort (assault) of one partner, on the ground that the assault was not committed within the scope of partnership business. In the instant case, however, as we have already indicated, the conduct complained of as warranting punitive damages *was* uncontrovertedly within the scope of the agency or the common business of the partnership. Consequently, even if there had been no evidence that the Meleskis and Chas. H. Steffey, Inc. had authorized, participated in or ratified that conduct, they would be jointly and severally liable for any punitive damages awarded therefor.

The Maryland rule of derivative liability for punitive damages is well settled. In *Safeway Stores, Inc. v. Barrack,* 210 Md. 168, 122 A.2d 457 (1956), it was argued by the appellant corporation that it was not liable for punitive damages because it had not authorized, ratified or participated in the tortious acts of its agent and employee, one Smith. The Court said, at 210 Md. 176-177:

"The reasoning that would support an award of punitive damages against Smith would not necessarily apply to his employer. Some courts have held that a principal is not liable for punitive damages unless the principal authorizes, ratifies or participates in the act complained of. *Lake Shore Ec. Railway Co. v. Prentice,* 147 U.S. 101; *Prosser, Torts* (2d ed.), p. 21; *Restatement, Torts,* § 909. Cf. *Wardman-Justice Motors v. Petrie,* 39 F.2d 512 (D. C.), and *Safeway Stores v. Gibson,* 118 A.2d 386, 388 (Mun. C. A., D. C.), in which cases the courts found evidence of express authorization or ratification from the terms of employment and the retention of the agent after the incident was reported. *But the Maryland cases take a less strict view.* In *Boyer & Co. v. Coxen,* 92 Md. 366, 371, punitive damages were allowed against an employer in an assault case, where there was no evidence of authorization, participation or

ratification. There was, of course, evidence that the servant was acting in furtherance of the master's business, although his action in beating the plaintiff with a wrench was 'wanton, high-handed and outrageous'. *See also Dennis v. Baltimore Transit Co.,* 189 Md. 610, 616, and *Balt. & Yorktown Turn. v. Boone,* 45 Md. 344." (Emphasis added.)

In *Boyer & Co. v. Coxen,* 92 Md. 366, 367-369, 48 A. 161 (1901), the Court explained the reason for the Maryland Rule:

"Some courts of high authority have adopted the rule that a principal is only liable in punitive damages for the act of his agent when the former has either given express authority to the agent or subsequently ratified his act, or was guilty of some misconduct himself in connection with it. When it is remembered that such damages are allowed by way of punishment to the offender as a warning to others, the doctrine sanctioned by those Courts cannot be said to be wholly without foundation to base it upon, for it is at least unusual to *punish* one person for the act of another, unless the former did either authorize or ratify it or take some part himself in what is complained of. But there are a number of instances in which the principal may be even criminally liable for the acts of his agent, for some of which see 1 *Ency. of Law* (2 ed.), 1161, n. 2, and in this State we have not followed the doctrine held by the Courts above referred to in civil suits. Although the rule adopted here may in some cases result in hardship to the principal, yet, if carefully applied, there is less danger of injustice in enforcing it, in proper cases, than in denying it in all cases unless the principal has actually participated in the wrong done by his agent or servant or authorized or ratified it. Any liability of the master for a tort of his servant is dependent upon the fact that the

servant was acting at the time in the course of his master's service, and for his benefit, within the scope of his employment. The master selects him for that service and knows, or ought to know, what sort of a person he is investing with authority to act for him. The servant is acting for his master when the wrong is done — it is in contemplation of law the act of the master. In a great many cases, a judgment against the servant would be of no value to the injured one and no punishment to the wrong-doer, as it could not be collected. Every character of business, of any considerable proportions, is for the most part conducted through agents and servants, and if the principal or master cannot be held responsible in punitive damages, it would in many, perhaps in most actions of torts, be equivalent to abolishing that character of damages, if he is to be relieved by reason of the fact that the act complained of was done by the servant, and not by him individually. This Court has therefore followed the rule that the master is not exempted from the liability for such damages merely because the act complained of was done by a servant, and not by the master himself, and in many cases exemplary damages have been allowed against the master for acts done by the servant, without express authority from the former or ratification by him having been shown.

In this case the jury was required to find that the agent, McKewen, was acting in the discharge of his *duty for which he was employed*, when he made the assault complained of, before it could render a verdict for the plaintiff, and, having so found, his principal was responsible in punitive damages, provided the facts were such as would have warranted that kind of damages, if the agent was being sued." (Emphasis in original).

We conclude from the cases cited (see also *Carl M. Freeman Associates, Inc. v. Murray,* 18 Md. App. 419, 306

A.2d 548 (1973)), that since the relationship of co-partners, each to the other, is that of principal and agent, the principle of derivative liability that renders the partnership and each partner liable in compensatory damages for the acts of a partner done within the scope of the partnership business also renders them liable for punitive damages.

For the reasons stated, it was not error to submit the issue of punitive damages to the jury as to all partners in this case.

### (c) *Statute of Limitations*

Appellants argue that the appellee's claim against them is barred by Md. Code Ann., Courts and Judicial Proceedings Article, § 5-101, which requires civil actions to be filed within three years from the date they accrue.

Three of the appellants, the two Meleskis and Chas. H. Steffey, Inc., did not file timely pleas of limitations to the counterclaim filed against them by the appellee. *See* Maryland Rule 342 c 2 (requiring limitations as a matter of defense to be "specially pleaded in actions *ex delicto*") and Rule 342 d 2 (requiring that a plea of limitations be filed within fifteen days of service of the counterclaim). The untimeliness of the plea as to them was raised by the appellee in its response to their pre-trial motion for summary judgment on limitations grounds. The court correctly ruled that the defense was not available to them. *Foos v. Steinberg,* 247 Md. 35, 230 A.2d 79 (1967).

It appears that the other appellant, Collins, also failed to file his plea of limitations within the time required by the Rules.[7] In his case, however, the appellee has raised no issue of its untimeliness either in the proceedings below or in this appeal. The untimeliness of the plea has therefore been waived and is not before us as an issue in the case. Md. Rule 1085.[8] The issue that is before us is whether, without regard

---

**7.** Appellee's "Third-Party Claim" against Collins was filed January 6, 1978 and served upon Collins on January 16, 1978. His pleas thereto, including the plea of limitations, were not filed until March 16, 1978.

**8.** *See also* Poe's Pleading and Practice, Vol. 2 (Sixth Ed.), § 618:

> ". . . [T]he failure of the defendant to file plea within the time prescribed by the rule of court will be waived if the plaintiff reply

to the untimeliness of the plea, the "Third-Party Claim" against Collins is barred by limitations as a matter of law or whether the trial judge was correct in submitting the issue to the jury.

Md. Code Ann., Courts and Judicial Proceedings Article, § 5-101, requires civil actions to be filed within three years from the date they accrue. In this case the action for fraud and deceit was filed on January 6, 1978. Ordinarily, a claim accrues when the wrong is committed, not when it is discovered. *Watson v. Dorsey,* 265 Md. 509, 290 A.2d 530 (1972). The appellee does not argue here that the fraud and deceit alleged by it occurred within three years prior to the filing of suit; rather that the beginning date for limitations was postponed until the fraud was discovered by Pinero in October, 1977 and that since the action was filed within three years of *that* time, the suit is not barred by limitations.

Md. Code Ann., Courts and Judicial Proceedings Article, § 5-203, provides:

"If a party is kept in ignorance of a cause of action by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud."

In view of the conflicting evidence and inferences therefrom concerning what the appellee knew and when he knew it, we cannot say, under all the circumstances, that the trial judge erred in not ruling as a matter of law that the action against Collins was barred by limitations. *See Herring v. Offutt,* 266 Md. 593, 599, 295 A.2d 876 (1972), where the Court of Appeals said:

"Whether a plaintiff's failure to discover his cause of action was due to his lack of diligence, or

and issue be joined. To avoid this result, the proper course for the plaintiff to pursue when the plea of limitations is filed too late is to move that it be not received — which motion will be granted almost as of course; the plea, if already filed by the clerk, will be stricken from the record."

to defendant's concealment of his wrong, is ordinarily a question for the trier of fact. [Citations omitted]."

## IV

Finally, appellants contend that the trial judge erred in his instructions concerning punitive damages. We find no reversible error — except in one important respect.

The jury was told, in effect, that where one partner "acting in the ordinary course of the business of the partnership" wrongfully acts or fails to act and thereby causes loss or injury to a non-partner, the other partners are liable for that loss or injury as well as for any punitive damages incurred "*to the same extent* as the partner sole acting or omitting to act." (Emphasis added). This . was consistent with the principle of derivative liability for punitive damages already discussed in this opinion. It is also consistent with the Maryland Uniform Partnership Act, Title 9 of Md. Ann. Code (1975), Corporations and Associations Article, § 9-305 and § 9-307.[9] We find no reversible error in that instruction. Later in his instructions, however, the judge instructed the jury as follows:

> "If you find that punitive damage should be awarded, then *you will consider a separate award as to each defendant* as set out in issue number 10." (Emphasis added).

---

**9.** "*§ 9-305. Partnership bound by partner's wrongful act.*

Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership, or with the authority of his copartners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act. (An. Code 1957, art. 73A, § 13; 1975, ch. 311, § 2.)"

"*§ 9-307. Nature of partner's liability.*

All partners are liable:

(1) Jointly and severally for everything chargeable to the partnership under §§ 9-305 and 9-306; and

(2) Jointly for all other debts and obligations of the partnership; but any partner may enter into a separate obligation to perform a partnership contract. (An. Code 1957, art. 73A, § 15; 1975, ch. 311, § 2.)"

Issue No. 10 and the jury's answer thereto was as follows: [10]

"10. If your answer to #9 is 'yes,' what punitive damages do you find as to:

| | |
|---|---|
| Arthur Meleski | $11,250.00 |
| Elizabeth Meleski | $11,250.00 |
| Charles H. Steffey, Inc. | $22,500.00 |

If you answered #1 'no,'
John S. Collins        $22,500.00"

Oddly enough *both* sides made timely objections to the form of issue No. 10. Though counsel for *appellee* now defends the instruction, he objected to it below:

"With reference to number 10 specifying the punitive damages can be found by the jury as to

---

10. The other pertinent issues submitted and the jury's answers were:

"1. Does the statute of limitations bar any claims against Mr. Collins?

Yes _____    No ___x___

2. Was there a mutual mistake as to the subject matter of the contract?

Yes _____    No ___x___

4. If your answer to #2 is 'no,' did the parties come to a new agreement — a new contract — after June 21, 1974?

Yes _____    No ___x___

5. If your answers to #2 and #4 are 'no,' did the partners commit fraud in the inducement of the contract of June 21, 1974?

Yes ___x___    No _____

6. If your answer to #5 is 'yes,' what compensatory damages do you find?

$4,068.00

9. If your answer to either #5 or #7 is 'yes,' and if you have awarded compensatory damages in either #6 or #8, do you find that punitive damages should be awarded against the partners?

Yes ___x___    No _____"

each individual or against each individual defendant, I'd respectfully indicate that, at least as the state of the law at this time, it is a joint and several obligation as I read the law and that the apportionment, although maybe more reasonable and ultimately required by the courts or the legislature, it is not the state of the law at this time and that the jury should probably have considered a joint and several verdict."

Counsel for Chas. H. Steffey, Inc., speaking for all appellants at the time, said:

".... [A]s did Mr. Snider [counsel for appellee], I also object to question ten. It seems to me first, that Your Honor states in the instruction that each partner is liable for the punitive damages as to one. And now in effect in the issues, Your Honor is inviting the jury to find in effect punitive damages as to all. Second, this suffers from the same objection which I've made to Your Honor several times and stated earlier in this presentation, and that is that it permits the jury to assess liability for punitive damages against partner 'as', not liability against partner 'b' and then proceed to assess no punitive damages against partner 'a', but then go ahead and impose punitive damages upon partner 'b', when they found that partner 'b' in and of partner 'b' himself or herself was not liable for punitive damages. Finally, with respect to number ten, my third point is, Your Honor, that once Your Honor has decided, as Your Honor did, to impute or impose punitive damages upon all when the jury found upon one, it seems to me it is inconsistent and unfair and inflationary to the finding of punitive damages to then double back and suggest to the jury in the last analysis that they find individual awards of punitive damages against the individual defendants. Thank you, Your Honor."

We think it was error to allow the jury to "consider a

separate award [of punitive damages] as to each defendant" in this case. It is true that the purpose of punitive damages is not so much to compensate the plaintiff but is, "over and above full compensation, to punish the wrongdoer, to teach him not to repeat his wrongful conduct and to deter others from engaging in the same conduct." *Wedeman v. City Chevrolet Co.,* 278 Md. 524, 531, 366 A.2d 7 (1976). Considering that purpose, there is considerable logic to support the individualization of punitive damage awards in cases where multiple defendants are all liable for one sum in compensatory damages but there are shown different degrees of complicity among the individual defendants in the wrongdoing giving rise to punitive damages. As we said in *Cheek v. J.B.G. Properties, Inc.,* 28 Md. App. 29, 43-44, 344 A.2d 180 (1975):

> "Those jurisdictions favoring apportionment seem to rely on the reasonable view that a jury should be permitted to vary the damages depending upon the degree of culpability since punitive or exemplary damages are not compensation for injury; instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence. *Cf., Gertz v. Welch, supra,* 418 U.S. at 350, 41 L.Ed.2d at 811."

In *Cheek* we reversed judgments entered against a corporate defendant and its employee for allegedly slanderous remarks made by the employee about the plaintiffs. The judgments included awards for punitive damages which the jury "apportioned" between the two defendants. More precisely, the jury made separate awards of punitive damages against each defendant.[11] The judgments were reversed and a new trial ordered on grounds

---

11. We use the word "apportionment" only for convenience and because other cases have employed it. In fact, this term is inaccurate as applied to punitive damages, in that it assumes the existence of a single sum that can then be divided. When a jury is allowed to "apportion" punitive damages, it does not first ascertain some abstract total award and then equitably apportion that among the multiple defendants; rather, the jury begins and ends by imposing a separate amount against each defendant determined by that defendant's individual culpability and estimated ability to pay.

not related to the "apportionment" issue. We, nevertheless, by way of strong dicta, if not by way of a holding, concluded "that Maryland *should* be in the majority of states permitting apportionment of punitive damages." *Id.* at 45 (emphasis added). In espousing this dicta for guidance of the trial judge to whom *Cheek* was remanded, we were influenced by the logic of allowing apportionment of punitive damages and the inequity inherent in a rule to the contrary. To fully accomplish their purpose, punitive damages must be imposed individually based upon the individual's culpability and financial means. Moreover, the introduction of evidence of financial worth of the defendants is bound to produce unfairness if the awards are not individualized.[12] *See Washington Gas Light Co. v. Lansden,* 172 U.S. 534; *Nance v. Gall,* 187 Md. 656, 50 A.2d 120 (1947); *Schloss v. Silverman,* 172 Md. 632, 192 A. 343 (1937).

Nevertheless, we are now squarely faced with the issue of, not whether Maryland *should* permit "apportionment" of punitive damages, but whether it *does* permit it. We conclude that it does not — at least where, as in this case, the defendants are in a principal-agent relationship. The reason for our conclusion is the Maryland rule heretofore discussed that liability for punitive damages, where there are multiple defendants who are in a principal-agent relationship, is joint and several without regard to their relative culpability. As this rule presently stands it does not permit the application of and cannot co-exist with a so-called "apportionment" rule that allows a separate award against each of several defendants measured by each defendant's individual culpability.

In *Nance v. Gall,* 187 Md. 656, 50 A.2d 120 (1947), the plaintiff, Gall, brought suit for malicious prosecution against a railroad superintendent, Nance, and the railroad company for allegedly wrongful conduct of the

---

12. In the present case, as in Nance v. Gall, *supra,* no evidence was introduced of the financial means of any of the defendants. Such evidence is not a prerequisite to awarding punitive damages. Fletcher v. Western National Life Insurance Co., 10 Cal. App. 3d 376, 404, 89 Cal. Rptr. 78 (1970).

superintendent in instituting criminal charges against him. A verdict in one sum for punitive damages was rendered against Nance and the railroad company. On appeal, the Court held that Nance acted beyond the scope of his authority and therefore reversed the judgment against the railroad company without a new trial. By its first opinion, the Court let stand the judgment against Nance, but later modified the opinion to reverse the judgment against Nance as well and awarded him a new trial. The Court felt that "the jury intended, by its verdict, to inflict punishment on both the corporate and individual defendants, and would not have rendered the verdict it did if the action had been instituted solely against Nance." *Id.* at 677. In the course of its modified opinion the Court said:

> "The verdict which the jury rendered was a joint verdict and it could not have been apportioned as to the two defendants." *Id.* 675.
>
> * * *
>
> "Appellee argues that Nance knew that *punitive damages* might be assessed against him as the case below was tried on that theory, and that the record is devoid of any suggestion that Nance was entitled to or sought separate consideration in the matter of damages. *But the jury could not apportion its judgment so as to make a part of it applicable to Nance and a part applicable to the railroad company. It could only render a joint judgment, and each would be responsible for the entire judgment.*" *Id.* 676. (Emphasis added).

In *Cheek v. J.B.G. Properties, Inc., supra,* we discerned from *Nance* and the cases there cited, acceptance of the principles for a punitive damage apportionment rule and apparently concluded that by the above-quoted language the Court was making an observation upon the dilemma of the jury in *that* case, rather than espousing binding legal concepts. However, in light of the clearly established Maryland rule of derivative liability for punitive damages, we have rethought

our former position. We do not now believe that *Nance* can be read so broadly as to allow us to effect a change in that rule so as to permit individualized awards of punitive damages in cases where, as here, the defendants are in a principal-agent relationship. Only the Court of Appeals or the Legislature is free to change this long standing Maryland rule that in our opinion prevents such awards.

Aside from what we have already said, in view of the inconsistent instructions on punitive damages (on one hand that all partners are liable for punitive damages to "the same extent" as any one partner, and, on the other hand, that separate amounts may be awarded against each of the partners), we think it is by no means clear that the jury intended a total punitive damage award of $67,500 rather than a total of $22,500 for which each partner [13] would be jointly and severally liable "to the same extent" as every other partner. The judgments actually entered, with respect to punitive damages, were *separate* judgments in favor of the appellee (counterclaim plaintiff and Third-Party Plaintiff below) against each of the partners of $22,500.00 for which each of them would be liable "jointly and severally and as partners." Obviously, a joint and several judgment for which each partner is individually liable is not consistent with the notion that each partner be liable for only his own individual culpability. This uncertainty as to the jury's intention would alone require a new trial on the issue of punitive damages.

With respect to compensatory damages, it is obvious that the jury intended a total award of $4,068.00 against all partners — not $4,068.00 separately against each partner. Yet, separate judgments, totalling $16,272 were entered for which the partners were, again, to be "jointly and severally liable and as partners." Clearly, as to compensatory damages, there should have been one joint judgment for $4,068.00 against all partners. This can be easily corrected upon remand.

---

**13.** The jury considered Mr. and Mrs. Meleski, who between them held a one-third interest in the partnership, as one unit. The other two partners each held a one-third interest.

For the reasons stated, we shall vacate the judgments entered and remand the case with direction to the trial court to enter one judgment for $4,068.00 in compensatory damages against all appellants. With respect to punitive damages, a new trial on that issue is awarded. For the guidance of the trial court, we point out that, in view of the issues already properly determined by the jury, the sole issue to be determined on remand is the *amount* of punitive damages that in the discretion of the trier of fact should be assessed jointly against the appellants as a result of their liability, already determined, for having committed fraud in the inducement of the June 21, 1974 contract.

> *Judgments vacated; case remanded for further proceedings not inconsistent with this opinion; costs to be paid one-half by appellants and one-half by appellee.*